## A93A1451. MULTIMEDIA WMAZ, INC. v. KUBACH.
### (443 SE2d 491)

POPE, Chief Judge.

In this invasion of privacy case, defendant appeals from a jury verdict awarding plaintiff $500,000 in general damages and $100 in punitive damages.

Plaintiff has Acquired Immune Deficiency Syndrome (AIDS). In December 1989, defendant television station produced a live call-in show on the topic of AIDS and drug use. Through his physician, Dr. Harold P. Katner, plaintiff agreed to participate. Defendant told Dr. Katner, and Dr. Katner told plaintiff, that his face would not be recognizable to the television audience; and plaintiff would not have participated in the show without this assurance that he would not be recognizable. Defendant planned to electronically distort plaintiff's image through a process called digitization. Defendant had previously aired another program on AIDS in which some of Dr. Katner's female patients appeared with their faces digitized. For the first seven seconds plaintiff was shown, however, the digitization was inadequate and plaintiff was recognizable. Defendant's employee testified that he pre-set the level of digitization, and that he thought it was sufficient.

He did not use plaintiff and the other participant to pre-set the digitization even though they were there and available, however; nor did he allow them to see the level of digitization and give them the opportunity to ask that it be increased as defendant had with the female patients on the earlier AIDS talk show. Defendant's employee also testified that he did not like to put the level of digitization too high because if he did so, the viewing audience would lose interest.

When plaintiff was first diagnosed with AIDS in late 1987, his physical condition was poor and he was depressed. After he began taking the drug AZT in the spring of 1988, however, he enjoyed a remarkable turnaround in both his physical and emotional condition. Plaintiff was upbeat and wanted to live as long as he could. He went out with friends often, and frequently would be greeted by people who knew him from when he owned and operated an extremely popular restaurant in Macon (1975-1985). In September 1989, plaintiff began working on a part-time basis at Peter Pan Cleaners. He worked 20 to 25 hours a week, waiting on customers and doing whatever needed to be done. His boss testified that he was outgoing and friendly. He was not actually paid a salary, but received the equivalent of $3.35 per hour in food, dry cleaning and use of a vehicle, as well as some cash. After defendant's broadcast, plaintiff became withdrawn, extremely depressed and almost suicidal. He refused to leave his home for fear of being recognized and pointed out as an AIDS patient, and this situation was exacerbated when his sister convinced him to go out to a fast food place and he was in fact recognized and harassed by several young people. Plaintiff was unable to continue working at the cleaners because he no longer felt he could deal with the public at the front counter, though he did work in the back for a few months during the cleaners' busy season — the only time his boss could afford to keep him on without waiting on customers. Dr. Katner testified that when a person has AIDS, stress and emotional upset often have a detrimental effect on their physical condition, and that in plaintiff's case it manifested itself in shingles, an extremely painful disease associated with stress. His physical condition, particularly his immune system condition, dropped dramatically after defendant's broadcast. This very bad situation lasted for about a year. Since then plaintiff has improved, but his condition is still worse than it was before the broadcast. Plaintiff sued defendant for invading his privacy by publicly disclosing private facts about him, and defendant appeals from the jury's verdict for plaintiff.

1. Defendant contends plaintiff "waived" his right to bring this action for public disclosure of private facts by making the fact that he had AIDS "public" prior to defendant's broadcast. Among the elements necessary to establish a cause of action for public disclosure of embarrassing private facts is the requirement that "the facts dis-

closed to the public must be private, secluded or secret facts and not public ones." *Cabaniss v. Hipsley*, 114 Ga. App. 367, 372 (151 SE2d 496) (1966). Accordingly, the protection afforded an individual's right to privacy may be waived or withdrawn " 'to whatever degree and in whatever connection [his] life has ceased to be private.' " Id. at 374. In *Cabaniss*, for example, we held that where an exotic dancer allowed various dancing establishments to use a particular publicity photo of her, she could not maintain an action for public disclosure of private facts against another dancing establishment (and the magazine it advertised in) for using the same photo without her permission. And in *Cummings v. Walsh Constr. Co.*, 561 FSupp. 872 (S.D. Ga. 1983), a federal district court applying Georgia law held that a woman could not sue her supervisor for public disclosure of private facts for telling co-workers about their affair when she herself had told other co-workers about their affair. As indicated by these cases, waiver in this context is a relative term: the scope of the waiver is related to and limited by the scope of the actions on which the waiver is based.

In this case, defendant points to evidence that prior to its broadcast, plaintiff: (a) appeared on a national television show, allowing his back to be viewed undigitized and his voice to be heard undisguised; and (b) acknowledged his disease to family members, friends, medical personnel and members of his AIDS support group. Plaintiff's face was adequately digitized in the earlier nationwide program, however, and the evidence did not show that his identity was revealed to the community by that broadcast. Moreover, we cannot agree that plaintiff made the fact of his disease public as a matter of law, thereby waiving his right to keep it from the entire television viewing public in Macon, by telling a relatively small number of people[1] he thought had reason to know of his disease; for unlike the disclosures of the plaintiffs and defendants in *Cabaniss* and *Cummings*, plaintiff's disclosure of the fact of his disease to his family, friends and support group and defendant's disclosure of plaintiff's identity as an AIDS patient to the television viewing public in Macon were similar in neither degree nor context.

"[The right of privacy] may be waived for one purpose and still asserted for another; it may be waived in behalf of one class and retained as against another class." *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 199 (50 SE 68) (1905). Plaintiff disclosed the fact that he had AIDS to family, friends, medical personnel and members of his support group. He wanted these individuals to know of his ill-

[1] Even if we accept defendant's estimate of approximately 60 individuals, this number is relatively small in relation to the television viewing public in the Macon area.

ness because they cared about him and/or because they also had AIDS. Although there was testimony that plaintiff did not explicitly tell his friends and family not to tell anyone else, there was also testimony that they understood that plaintiff's condition was not something they would discuss indiscriminately. Defendant's disclosure went far beyond the scope of any prior disclosure by plaintiff, in terms of both audience and purpose. Moreover, defendant explicitly agreed to respect plaintiff's privacy in order to secure his participation in the show. Under these circumstances, the jury was authorized to find that the fact that plaintiff had AIDS was not public prior to defendant's broadcast, and the trial court did not err in denying defendant's motion for directed verdict on this ground.

2. Defendant also argues that it cannot be liable for its disclosure of plaintiff's identity as an AIDS patient because the disclosure occurred during a broadcast on a matter of public interest, citing *Waters v. Fleetwood*, 212 Ga. 161 (91 SE2d 344) (1956); *Tucker v. News Pub. Co.*, 197 Ga. App. 85 (1) (397 SE2d 499) (1990); *Cox Communications v. Lowe*, 173 Ga. App. 812 (1) (328 SE2d 384) (1985); and *Ramsey v. Ga. Gazette Pub. Co.*, 164 Ga. App. 693 (1) (297 SE2d 94) (1982). Each of the cases cited by defendant holds that a publisher of information regarding a criminal incident or investigation does not invade the privacy of those involved in that incident or investigation when it identifies them, even if they are involved in the incident or investigation through no fault of their own;[2] a crime is a matter of legitimate public interest, and the individual's privacy interest is outweighed by first amendment interests in free expression regarding matters of legitimate public interest. See, e.g., *Waters*, 212 Ga. at 167. These cases do not control this situation, however, because plaintiff in this case was not involved in a criminal incident or investigation. Unlike the identities of those involved in crimes, the identities of those suffering from AIDS are generally *not* a matter of public interest, as our legislature has recognized. See OCGA § 24-9-47 (b) & (o) (placing restrictions on disclosure of "AIDS confidential information" and making it a misdemeanor to violate those restrictions) and § 31-22-9.1 (2) (defining "AIDS confidential information" to include the fact that the person is being treated for AIDS). Moreover, we note that defendant in this case, unlike the defendants in the cases it relies on,

---

[2] Defendant suggests that in *Lowe*, as in this case, the plaintiff was not involved in a criminal incident or investigation, and the trial court's denial of the publisher's motion for summary judgment was nonetheless reversed there. However, the plaintiff in Lowe, while not *directly* involved in a criminal investigation, was a prisoner in an institution under investigation; and the fact of his incarceration (the "disclosure" of which was the subject of his lawsuit) was already a matter of public record. Here, plaintiff is not even indirectly involved in a criminal investigation, and the fact of his disease was not a matter of public record prior to this broadcast.

was only in the position to disclose plaintiff's identity as an AIDS patient because of its promise to plaintiff that there would be no such disclosure. Cf. *Cohen v. Cowles Media Co.*, ___ U. S. ___ (111 SC 2513, 115 LE2d 586) (1991) (first amendment does not prohibit recovery of damages from newspaper for breach of promise to keep source's name confidential).

Defendant suggests we should nonetheless rule in its favor on policy grounds, perhaps fashioning a rule analogous to the Good Samaritan Statute (OCGA § 51-1-29) which would provide that broadcasters should be insulated from liability for anything that happens as a result of their negligence when they are broadcasting a "public service" show. Otherwise, it posits, broadcasters will refuse to produce shows with AIDS patients such as the one plaintiff participated in because of fear of liability, and these shows are important to educate the public. This policy argument cuts both ways, however: broadcasters may shy away from producing such shows if this verdict is upheld, but AIDS patients who have not publicly acknowledged their disease may refuse to participate in such shows if it is not. In any case, the policy decision is one for the legislature to make, as it did when it passed the Good Samaritan Statute.

3. Defendant next argues that its motion for directed verdict should at least have been granted with respect to punitive damages. "Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." OCGA § 51-12-5.1 (b). We agree that the evidence was insufficient to support an award of punitive damages. We do not agree that the entire award (including the general damage award) must be vacated because the $100 punitive damages award is unsupported, however. *Petrolane Gas Svc. v. Eusery*, 193 Ga. App. 860 (389 SE2d 355) (1989), in which we vacated an entire award because the trial court improperly instructed the jury on punitive damages, is distinguishable because the verdict in that case was a *general* verdict: the jury did not specify how much of its award was for general damages and how much was for punitive damages, and we could not guess. Here, on the other hand, the trial court held a bifurcated trial as mandated by OCGA § 51-12-5.1 (d), and having been properly instructed, the jury awarded $500,000 in general damages and $100 in punitive damages. The $500,000 is identifiable and separable and was in fact the minimum amount sought by plaintiff for his general damages. There is no suggestion that any evidence was admitted in the first portion of the trial which would not have been admitted had the possibility of punitive damages been excluded. Thus, we affirm the judgment below on condition that the punitive

damage award be written off. See *Cassidy v. Wilson*, 196 Ga. App. 6, 9 (395 SE2d 291) (1990).

4. Defendant contends that since plaintiff took the position that his homosexual lifestyle was irrelevant to the issues at trial, the lower court erred in excusing for cause three potential jurors who expressed bias against homosexuals. This contention is without merit. See *Morris v. Bonner*, 183 Ga. App. 499 (1) (359 SE2d 244) (1987) (trial court has broad discretion in dismissing potential juror for bias).

5. Defendant argues that the trial court erred in submitting the question of lost wages to the jury. It argues that there is insufficient evidence of what plaintiff might have earned, so any award must be speculative. We disagree. Plaintiff and his former boss testified that prior to the broadcast, plaintiff worked 20 to 25 hours a week for the equivalent of $3.35 an hour. Plaintiff's former boss also testified that she would have continued to employ plaintiff indefinitely if he had been able to wait on customers, but that he was unable to do so after the broadcast because he was afraid to deal with the public. This evidence provided a sufficient basis for an award of lost wages.

6. Defendant asserts that the trial court erroneously ruled that damage to reputation is not a necessary element of an invasion of privacy cause of action, and consequently erred in excluding evidence defendant wanted to introduce regarding plaintiff's social history. We agree with the trial court that damage to reputation is not necessary to establish an invasion of privacy. While language in the early cases suggested that the interest protected by the tort was that of reputation, see, e.g., *Cabaniss*, 114 Ga. App. at 372, more recent cases have recognized that invasion of privacy is an action for personal injury which may involve injury to reputation but also may involve injury to "the plaintiffs' personal sensibilities and mental repose." *Hudson v. Montcalm Pub. Corp.*, 190 Ga. App. 629, 634 (379 SE2d 572) (1989). In this case, plaintiff presented evidence that defendant's actions caused him severe mental distress with physical repercussions. Thus, the absence of evidence of damage to his reputation is not fatal to his cause of action. Moreover, we note that the evidence defendant sought to introduce — excerpts from the "Social History" portion of plaintiff's medical records — would not have been relevant to show reputation anyway, as it did not reflect information known in the general community.

7. We have reviewed defendant's remaining enumerations of error and find them to be without merit.

*Judgment affirmed on condition. Cooper, Johnson and Blackburn, JJ., concur. Beasley, P. J., concurs and also concurs specially. McMurray, P. J., Birdsong, P. J., Andrews and Smith, JJ., dissent.*

BIRDSONG, Presiding Judge, concurring in part and dissenting in part.

I agree that the evidence does not adequately raise the issue of punitive damages, and that the trial court erred in denying appellant's (WMAZ) motion for directed verdict as to punitive damages. However, in my view, prejudicial error resulted when the jury was given a totally *unauthorized* charge as to punitive damages at the same time it was instructed and subsequently deliberated as to the issue of liability and general damages; *in this instance,* by so placing the *unauthorized* issue of punitive damages before the jury, a fair risk of taint reasonably was created as to the $500,000 general damage award.

1. Applying the review standard of "any evidence" (*Mattox v. MARTA,* 200 Ga. App. 697, 698 (1) (409 SE2d 267)), it is my conclusion that the trial court erred in denying appellant's motion for directed verdict as to punitive damages.

The statutory standard for award of punitive damages is promulgated in OCGA § 51-12-5.1. By statute, something more than mere commission of a tort is required to support the imposition of punitive damages. *Troutman v. B. C. B. Co.,* 209 Ga. App. 166, 168 (433 SE2d 73). Even gross negligence will not authorize the recovery of punitive damages. Id.

Before trial appellee was requested to make admissions, pursuant to OCGA § 9-11-36. Among the admissions made by appellee were that "the master videotape revealed that at no time [was appellee] undigitized," and that he did not contend the tape had been altered or subject to tampering. In any event, testimony was presented by appellant that the program director pre-set the level of digitization and checked it for adequacy and the production manager also saw the digitization level and considered it adequate. Although the evidence was in conflict as to the level of digitization that was pre-set or whether any digitization had been effected by the procedure attempted to be employed, the testimony to the effect that appellant's personnel had at least attempted to pre-set the digitization was not controverted either directly or indirectly by reasonable inference. Moreover, examination of the tape conclusively establishes that after the initial momentary revealing of appellee's face, an adequate level of digitization was obtained within seven seconds due to corrective action immediately being effected by appellant's personnel. Further, the tape shows that a slide of a skin lesion was immediately displayed, and there exists some expert opinion testimony that this was done to enable station personnel time to correct the digitization problem.

Where, as in this case, the defendant has exercised at least some degree of care, and even though its lack of strict control to protect

appellee's identity from disclosure as a person who has contracted AIDS may have amounted to negligence or even gross negligence, it does not constitute any evidence of wilful misconduct or of an entire want of care necessary to support a jury award of punitive damages. Compare *Wilson v. Brighton Homes*, 204 Ga. App. 677, 680 (4) (420 SE2d 360); *Powell v. Ferreira*, 198 Ga. App. 465 (402 SE2d 85). The evidence, as a matter of law, was insufficient to support a finding of wilful misconduct, malice, fraud, wantonness, oppression, or that entire want of care, as required by OCGA § 51-12-5.1 (b). After construing the evidence most favorably for appellee, a verdict in favor of appellant/defendant was demanded as to punitive damages. See *Wilson*, supra; see generally *Pendley v. Pendley*, 251 Ga. 30 (302 SE2d 554). Accordingly, as must be conceded by the majority, appellee was not entitled either to have the jury charged *or to have them consider* any issue of punitive damages in arriving at their verdict.

2. Assuming appellee did not totally waive his right of privacy — at least as to those persons outside the station viewing the broadcast via television — the question remains whether the $500,000 general damage verdict can be sustained in view of the erroneous consideration of the question of punitive damages by the jury. In this instance, the initial charge to the jurors requiring them to determine whether punitive damages should have been imposed created a fair risk of taint to the general damage award notwithstanding the bifurcated proceedings conducted as to the ultimate award of punitive damages. The jury was given a detailed charge on punitive damages after being advised that "[i]n tort actions, there may be *aggravating circumstances* which may warrant the awarding of additional damages called punitive damages." (Emphasis supplied.) This charge did not expressly instruct the jury as to what point in the proceeding the amount of such additional damages would be determined if the jury found it should be awarded. The record on its face establishes that the jury awarded $500,000 compensatory damages to appellee, but in the subsequent bifurcated proceeding awarded appellee punitive damages of only $100, as against defendant corporate entity. This $100 punitive damage award was made notwithstanding that the jury was instructed by the court that "punitive damages shall be awarded not as compensation to a plaintiff but solely to punish, penalize or deter a defendant." This is a correct statement of the statutory purpose of punitive damages. OCGA § 51-12-5.1 (a), (c).

I believe, as a matter of law, that a punitive damage award of only $100, under the existing circumstances, is so grossly disproportionate when compared to the substantial general damage award adjudged, and is so blatantly incapable of fulfilling the statutory purposes to punish, penalize, or deter, that it cannot be ruled out that the jury erroneously included punitive damage elements within their

$500,000 general damage award. Compare *Petrolane Gas Svc. v. Eusery*, 193 Ga. App. 860, 862 (2) (389 SE2d 355). Because a reasonable potential or a fair risk for such error exists, appellant WMAZ has been denied a right of fair trial as to these matters. I agree with the analysis of Presiding Judge Beasley in *Petrolane* that even assuming appellee were to counter that "there was evidence of compensatory damage alone to support the amount of the award to [appellee], . . . the jury was not obligated to award all actual damage that the evidence might have authorized. That evidence, when compared with the verdict [in its totality], does not lead inexorably to the conclusion that only compensatory damages were awarded." Id. at 863. (Incidentally, the record reveals that the maximum range of damages which the jury could have found to have been proven by appellee, due to any actual loss of wages, would sustain but a relatively small portion of the $500,000 general damage award.) It cannot inexorably be concluded, under the existing circumstances, that the verdict for general damages did *not* include *unauthorized* additional or punitive damages based on perceived aggravating circumstances. Id.

Contrary to the majority's view, the $500,000, although identifiable is not, under the attendant circumstances, separable from the punitive damages award. The token award of only $100 punitive damages strips the insulating veneer of a bifurcated proceeding from the general damages award; the reasonable potential of a clear risk that *unauthorized* punitive damage considerations have permeated the $500,000 general damages award is inescapable. The harm here arises by virtue of the following procedure: the jury, during the liability and general damages phase of the bifurcated proceeding, was *erroneously instructed* they could consider whether to award punitive damages, *decided* that such an award was appropriate (thereby having found the existence of unauthorized aggravating factors), and *not being instructed* when and how a punitive award was to be made by them thereby was left to speculate as to how such an award was to be effected. This procedure when viewed in the context of what actually happened in the second stage of the bifurcated proceedings (that is, the award of a punitive damage amount so low that as a matter of law it could not have been adjudicated in accordance with punitive damage instructions given) gives rise to the fair risk of taint to the $500,000 award. It is not the nature of the evidence admitted in the first portion of the trial or the alleged minimum amount of damages sought by appellee that is relevant (particularly, where the nature of the general damages sought in large measure is incapable of precise mathematical calculation); what is relevant is whether a fair risk is reasonably created that the jury added punitive damages into its general damage award calculation. *Cassidy v. Wilson*, 196 Ga. App. 6, 9 (395 SE2d 291) relied on by the majority to write off the punitive

damages is inapposite to the facts of this case; the punitive damages award in *Cassidy* did not on its face reflect that it was a mere token award giving rise to a reasonable fair risk of taint to the entire general damage award. Although Multimedia WMAZ is a corporation, it too is entitled to a fair trial as to damages.

*Additionally,* "[i]nstructions not warranted by the evidence are cause for new trial unless it is apparent that the jury could not have been misled thereby." *Harden v. Drost,* 156 Ga. App. 363, 366 (4) (274 SE2d 748). When, as here, a charging error is shown to have occurred, it is presumed to be prejudicial and harmful, and this court will so hold unless it appears from the entire record that the error is harmless. *Foskey v. Foskey,* 257 Ga. 736 (2) (363 SE2d 547). The record does not support a finding of harmless error, particularly in view of the obvious discrepancy between the amount of general and punitive damages awarded by the jury.

This judgment must be reversed and a new hearing conducted, at least, as to the issue of compensatory damages.

I am authorized to state that Judge Smith joins in this opinion.

BEASLEY, Presiding Judge, concurring specially.

Upon reconsideration, the fallacy of the previous majority position has been made clear. There was no waiver of the right to retain from general public knowledge, as disseminated by public broadcast media, the fact that plaintiff, a private person, had contracted AIDS. This is so because, first of all, he had expressly reserved the right to nondisclosure of his identity and the defendant had agreed to conceal it as a condition of his participation in the show.

There are constitutionally protected zones of privacy, some of which are identified in *Griswold v. Connecticut,* 381 U. S. 479, 484-486 (85 SC 1678, 14 LE2d 510) (1965). Sixty years previously, the Supreme Court of Georgia expressly acknowledged in Georgia law the right of privacy, and the concept that it has many forms. *Pavesich v. New England Life Ins. Co.,* 122 Ga. 190 (50 SE 68) (1905). In describing it, one of the court's illustrations was that one "may wish to live a life of privacy as to certain matters and of publicity as to others." Id. at 196. The right's foundation is in "the instincts of nature," id. at 194, among which are "the right of personal security and the right of personal liberty." Id. at 195. The Georgia Supreme Court recently highlighted these in *Yarbray v. Southern Bell Tel. &c. Co.,* 261 Ga. 703, 704 (1) (409 SE2d 835) (1991). *Griswold* referred to this same " 'indefeasible right of personal security, personal liberty and private property' " as the source of the Fourth and Fifth Amendments. *Griswold,* supra at 484, footnote. *Pavesich* did not describe the right as being scattered in penumbras throughout the guarantees of the bill of rights, as did *Griswold.* Instead, it declared the right of privacy,

within certain limits, to be "guaranteed to persons in [Georgia] by the constitutions of the United States and of the State of Georgia, in those provisions which declare that no person shall be deprived of liberty except by due process of law." *Pavesich*, supra at 197. In addition to being guaranteed by Paragraph I of our State's Bill of Rights, it is more directly guaranteed by Paragraph XXVIII: "The enumeration of rights herein contained as a part of this Constitution shall not be construed to deny to the people any inherent rights which they may have hitherto enjoyed." At the time of *Pavesich*, it was the Constitution of 1877, Art. I, Sec. V, Par. II.

In any event, the right of privacy extends to embarrassing private facts which, if invaded by unauthorized public disclosure, gives rise to a tort claim against the discloser. *Cabaniss v. Hipsley*, 114 Ga. App. 367, 370, 372 (151 SE2d 496) (1966). It has been described as " 'the tort of public disclosure,' . . . in which the plaintiff claims the right to be free from unwanted publicity about his private affairs, which, although wholly true, would be offensive to a person of ordinary sensibilities." *Cox Broadcasting Corp. v. Cohn*, 420 U. S. 469, 489 (95 SC 1029, 43 LE2d 328) (1975). See also Restatement (Second) of Torts, § 652D. Only for the purpose of this appeal, in which no issue is made with respect to the jury's finding in this regard, I assume that the fact that a person has AIDS is offensive to one who learns of it and embarrassing to one who has it.

In this case, plaintiff agreed to the public disclosure of many facts concerning his condition and experience, as this was a talk show and he was subject to unrehearsed questions. But he was to appear anonymously, with his identity a secret from the general public which would be watching and listening. He carved out a zone of privacy which he refused to relinquish and which, as to defendant, he was assured would be protected. That "zone" related not only to *what* could not be disclosed about him; it related also to those to *whom* disclosure was chosen not to be made. The zone of information and the zone of persons informed are both implicated.

The fact that plaintiff had the medical condition AIDS was at first a totally personal and private fact save, it is reasonably inferred, for the medical personnel who discovered it and told him. (Others may have known from them, but there is no evidence of it.) From that point on, he shared the fact with people he selected, for personal purposes and in his own way and time and within his control or within the control of persons he trusted to restrict the information judiciously. He did not broadcast it or authorize others to broadcast it generally, out to members of the public whom he did not know and who did not know him even indirectly.

As to whether the fact is "private, secluded or secret" on the one hand, which it must be in order for disclosure to be recoverable, or

"public" on the other hand, which is not protected (*Cabaniss*, supra at 372), is a matter of degree. There is a continuum from what is *purely* private (a fact only I know about myself) to what is purely public (a fact broadcast by the media). Disclosing a fact to another person does not make it "public" in the commonly understood sense. The question is, at what point, in the numbers or categories of people, does the exposure of the fact become public? What makes it "public?" Telling one hundred members of a confidential support group may retain its private nature for the purposes of this tort, whereas telling one newspaper reporter would give it a decidedly public nature.

It was a jury question in this case, although at times the question may be determined as a matter of law. It was not waived as a matter of law, because there was evidence of an express non-waiver against general public disclosure to thousands of people in and near plaintiff's place of residence, plus an agreement to honor it. In addition, there was evidence that plaintiff's disclosures were limited, discriminate, and not so far-reaching as to be conclusively categorized as "public" even though they were, to an extent, uncontrolled. As stated in *Pavesich*, "[t]he right of privacy may be waived either expressly or by implication, . . . ; but a waiver authorizes an invasion of the right only to such an extent as is necessarily to be inferred from the purpose for which the waiver is made. A waiver for one purpose and in favor of one person or class does not authorize an invasion for all purposes or by all persons and classes." *Pavesich*, supra at 191.[3] As repeated and applied in *Doe v. Sears*, 245 Ga. 83, 87 (263 SE2d 119) (1980), "the waiver carries with it the right to an invasion of privacy only to such an extent as may be legitimately necessary and proper in dealing with the matter which has brought about the waiver." *Pavesich*, supra at 199.

The fact that plaintiff had brought selected people into the protected zone of privacy, or expanded it to include them, did not necessarily erase the zone's borders. There was evidence that the zone reserved was a fairly confined one, bounded by a relatively small expanse of private or discrete disclosure, as distinct from general public knowledge. There was also evidence that the defendant gave the fact broad public dissemination, beginning with the unidentified in-studio audience which saw him live, and going on to the general viewing public due to the insufficiency of the digitization and the detectable display of his features, clothing, body build, physical mannerisms, and hair color, particularly before digitization was enhanced.

---

[3] *Cox Broadcasting Corp.*, supra at 494, points out that the commentary to the Restatement limits the tort to instances where the publicity is of facts not already made public.

ANDREWS, Judge, dissenting.

Plaintiff sued defendant on the basis of invasion of privacy for damages resulting from the disclosure that he has AIDS to persons viewing the broadcast.

Defendant contends that, prior to the broadcast, plaintiff had waived his right to privacy by disclosing he has AIDS to numerous persons. The plaintiff's invasion of privacy action was based on his claim that defendant publicly disclosed an embarrassing private fact about him — that he has Acquired Immune Deficiency Syndrome (AIDS). "There are at least three necessary elements for recovery under this theory: (a) the disclosure of private facts must be a public disclosure; (b) the facts disclosed to the public must be private, secluded or secret facts and not public ones; (c) the matter made public must be offensive and objectionable to a reasonable man of ordinary sensibilities under the circumstances." *Cabaniss v. Hipsley*, 114 Ga. App. 367, 372 (151 SE2d 496) (1966).[4]

As to the second element, there was undisputed evidence that the fact plaintiff has AIDS had been disclosed to numerous persons prior to the broadcast. The plaintiff testified that the fact he has AIDS had been disclosed by him to nine of his friends; one daughter of a friend; three television employees involved in a previous broadcast; about ten members of an AIDS support group which he attended; six medical personnel including his personal physician and medical support staff; six family members including his mother, father, two sisters, brother-in-law and aunt; an unknown number of persons in local AIDS support organizations; other doctors and medical personnel who had treated him; and three persons with whom he had sexual relations. One of the plaintiff's sisters, who lived out of state, testified that she disclosed plaintiff has AIDS to three of her bosses at work, several other friends at work, and to a number of personal friends outside of work. She testified it was not something she tried to keep secret, and that the plaintiff left disclosure up to her own good judgment. The plaintiff's aunt testified that she disclosed plaintiff has AIDS to her mother, her son, and her brother-in-law. One of the plaintiff's friends testified that he disclosed the plaintiff has AIDS to his three sisters, his brother, and to two of his friends. When questioned about how AZT treatment had affected his AIDS condition prior to the broadcast, the plaintiff testified in general terms that: "I had many young people coming and asking me, you know, why was I doing so well?

---

[4] That first element is undisputed here in that the disclosure that plaintiff has AIDS took place by means of a television broadcast to the general viewing public within the broadcast area. As to the third element, the parties do not raise the issue, and it is assumed for present purposes that public disclosure that the plaintiff has AIDS would be "offensive and objectionable to a reasonable man of ordinary sensibilities." *Cabaniss*, supra at 372.

How was I doing so well? And that's one of the reasons I went on the show, because I wanted to let them know you can live with AIDS, you don't have to die with AIDS. . . ."

"The right of privacy . . . like every other right that rests in the individual, may be waived by him, or by any one authorized by him, or by any one whom the law empowers to act in his behalf, provided the effect of his waiver will not be such as to bring before the public those matters of a purely private nature which express law or public policy demands shall be kept private. This waiver may be either express or implied, but the existence of the waiver carries with it the right to an invasion of privacy only to such an extent as may be legitimately necessary and proper in dealing with the matter which has brought about the waiver. It may be waived for one purpose and still asserted for another; it may be waived in behalf of one class and retained as against another class; it may be waived as to one individual and retained as against all other persons." *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 191 (8), 199 (50 SE 68) (1905). "[T]o whatever degree and in whatever connection a man's life has ceased to be private[,] to that extent the protection is to be withdrawn." (Citation and punctuation omitted.) *Cabaniss*, supra at 374.

It is undisputed that the plaintiff's disclosure of his AIDS condition to certain classes of persons such as medical personnel involved with plaintiff's treatment was done with an expectation that confidentiality is required and that any further disclosure by these persons would be strictly limited to others properly concerned with the plaintiff's medical treatment. See OCGA § 24-9-47 (disclosure of AIDS confidential information). There is no waiver of the right to privacy when disclosure of a private fact is limited to persons or a class of persons who are required by law or public policy to keep the disclosure private. *Pavesich*, supra. Moreover, it is possible for a person to only partially waive his right to privacy by, for example, waiving his entire right to privacy as to one fact but retaining it in full as to other private facts or by limiting disclosure of a private fact to a certain class of persons and retaining a privacy right in the same fact as to all others. See *Doe v. Sears*, 245 Ga. 83, 87 (263 SE2d 119) (1980).

This case deals with the plaintiff's contention that he limited the disclosure of the private fact that he has AIDS to a certain class or group of persons and retained a right of privacy in that fact as to other persons who saw him identified as an AIDS patient on the broadcast. By definition, the plaintiff's AIDS condition had been disclosed prior to the broadcast to only a "class" of persons, since not everyone knew he had AIDS. However, the evidence in this case shows that the "class" of persons who knew the plaintiff had AIDS included the plaintiff's immediate family members, a group of extended family members, members of plaintiff's AIDS support group

who apparently had signed an agreement of confidentiality, friends of the plaintiff and those with whom he was sexually involved, family members and friends of one of plaintiff's friends, an indefinite number of persons involved with AIDS support organizations, an indefinite number of co-workers and personal friends of one of the plaintiff's family members, and the "many young people" referred to by the plaintiff who inquired about his ability to live with AIDS during his AZT therapy. While indicating that he had concerns about disclosure of his AIDS condition because of potential adverse public reaction, the plaintiff testified he was not ashamed of the fact that he had AIDS, and that he "told my friends as it came about for whatever reason it came about." There was evidence the plaintiff told a family member to exercise her own discretion in disclosing his condition.

It need not be decided here to what extent certain immediate family members or others included in the "class" who knew the plaintiff had AIDS, are persons bound by law or public policy to maintain confidentiality. Whether or not the plaintiff expected those he told not to tell others, and whether or not those he told breached a duty not to further disclose his AIDS condition, is not the issue in this case. Here, the plaintiff seeks to recover money damages against the defendant for disclosing his AIDS condition to the broadcast audience based on a claim that his condition was a private, secret or secluded fact, not a public fact. The issue here is whether or not the plaintiff's secret had been made public prior to the broadcast, regardless of how it was disclosed. The majority focuses on those persons whom the plaintiff personally told he had AIDS and the plaintiff's expectation that they would not indiscriminately further disclose this fact. This ignores evidence that, rightly or wrongly, those he told, told numerous other persons of the plaintiff's condition, with the result that, with or without the plaintiff's permission, an indefinitely large number of persons knew of the plaintiff's AIDS condition.

The evidence shows that as a result of disclosures made directly by the plaintiff, or subsequent disclosures made by persons he told, a large, indefinite number of persons, not required by law or public policy to maintain confidentiality, knew the plaintiff had AIDS. The initial and subsequent disclosures set in motion a progression of further disclosures to an expanding "class" of persons. Obviously, the broadcast identified the plaintiff as an AIDS patient to persons outside this "class" who did not previously know. Nevertheless, the number of persons who knew in relation to the number who did not know is not controlling in this case. The crux of the matter is that disclosure of his condition had been made by the plaintiff or others to a sufficient number of persons not bound by law or public policy to maintain privacy, such that the plaintiff voluntarily relinquished, or by disclosures made by others, involuntarily forfeited, any expectation that his

AIDS condition was a secret. In other words, although the disclosures were limited to a "class" of persons in the sense that disclosures had not previously been made to all the people who saw the plaintiff identified on the broadcast, the persons who knew prior to the broadcast did not constitute a "class" of persons to whom disclosure was a limited waiver of the right to privacy, since it included a large, indefinite number of persons in which the plaintiff had no legitimate expectation of confidentiality. The numerous disclosures, made or set in motion by the plaintiff, introduced the private fact that he has AIDS into the public domain such that he could not have had any reasonable expectation that this fact remained a private matter. There is a point of disclosure beyond which a matter is no longer private in any reasonable sense even though everyone does not know about it. Since that point of public disclosure was clearly reached in the present case prior to the broadcast, I conclude, as a matter of law, that the plaintiff wholly waived a right to privacy in his AIDS condition and retained no right of privacy as to those in the broadcast audience who did not know he had AIDS at the time of the broadcast. See *Cummings v. Walsh Constr. Co.*, 561 FSupp. 872 (S.D. Ga. 1983).

Nevertheless, I conclude the plaintiff has a cause of action in this case apart from a common law claim for invasion of privacy. It is clear that the defendant television station agreed that it would conceal the plaintiff's identity when he appeared on the broadcast so that his identity as an AIDS patient would not be revealed to viewers who did not know he had AIDS. Even though the defendant had no duty not to violate the plaintiff's common law right to privacy as to this fact, since none existed, the defendant voluntarily undertook a duty to conceal the plaintiff's identity as an AIDS patient from disclosure to viewers of the program. "[O]ne who undertakes to do an act or perform a service for another[, and thereby induces reliance,] has the duty to exercise care, and is liable for injury resulting from his failure to do so, even though his undertaking is purely voluntary or even though it was completely gratuitous, and he was not under any obligation to do such act or perform such service, or there was no consideration for the promise or undertaking sufficient to support an action ex contractu based thereon." (Citations and punctuation omitted.) *McGinty v. Goldens' Foundry &c. Co.*, 208 Ga. App. 248, 250 (430 SE2d 185) (1993); *Stelts v. Epperson*, 201 Ga. App. 405, 407 (411 SE2d 281) (1991); *Cunningham v. Nat. Svc. Indus.*, 174 Ga. App. 832, 835-836 (331 SE2d 899) (1985). By virtue of the defendant's undertaking to conceal the plaintiff's identity, and the plaintiff's reliance on this undertaking, a duty arose for the defendant to carefully perform this task, the violation of which would support a cause of action for damages similar to those flowing from an invasion of privacy action resulting from the defendant's failure to perform.

Although the pre-trial order entered in the case states that the plaintiff's cause of action is based on the tort of invasion of privacy, the plaintiff's allegations in the pre-trial order, liberally construed, and the evidence on which the case was tried, were sufficient to embrace a tort action based on the above duty assumed by the defendant. *Cooper v. Rosser*, 232 Ga. 597, 598 (207 SE2d 513) (1974); *Fussell v. Carl E. Jones Dev. Co.*, 207 Ga. App. 521, 522-523 (428 SE2d 426) (1993). However, the trial judge charged the jury that the case was based solely on the tort of invasion of privacy, and followed with extensive instructions on the law applicable to the tort of invasion of privacy. Although a short charge was given that the defendant had a duty to diligently carry out any promise it made not to reveal the plaintiff's identity, this instruction was given within the context of the instructions regarding invasion of privacy. Accordingly, this case was submitted to the jury solely on the theory of invasion of privacy, which was inapplicable as a matter of law, since the plaintiff had waived the privacy right he asserted.

The defendant moved for a directed verdict on the invasion of privacy action on grounds other than waiver, and subsequently made a motion for j.n.o.v. based on the grounds previously raised and waiver, which was denied by the trial court. The denial of j.n.o.v. on the waiver issue was enumerated as error on appeal. Grounds asserted in a motion for j.n.o.v. which were not asserted in a motion for directed verdict will not be considered on appeal. OCGA § 9-11-50 (b); *Famiglietti v. Brevard Med. Investors, Ltd.*, 197 Ga. App. 164, 167 (397 SE2d 720) (1990). Nevertheless, in addition to error claimed in the denial of its motion for directed verdict on grounds other than the waiver issue, the defendant also enumerated error in the denial of its motion for a new trial on the basis that the verdict was contrary to law, the evidence and principles of equity and justice. Although there was some evidence upon which the jury might have based a proper verdict on a cause of action alleging the defendant assumed and breached a duty not to disclose the plaintiff's identity, it is clear in light of the trial court's charge that the case was not submitted to the jury on the basis of this evidence nor was the verdict based on this cause of action. Rather, it was based on the evidence and law relating to a cause of action for invasion of privacy. Since the verdict was based on the erroneous legal theory of invasion of privacy, the defendant was entitled to a new trial. See *England v. Georgia-Florida Co.*, 198 Ga. App. 704, 705 (402 SE2d 783) (1991); *Dept. of Transp. v. Fru-Con Constr. Corp.*, 206 Ga. App. 821, 825 (426 SE2d 905) (1992); *Bank South Mtg. v. Starr*, 208 Ga. App. 19 (429 SE2d 700) (1993) (motion for new trial reaches errors of law and fact contributing to the rendition of the verdict).

I am authorized to state that Presiding Judge McMurray and

Presiding Judge Birdsong join in this dissent.

### ON MOTION FOR RECONSIDERATION.

During the pendency of defendant's motion for reconsideration, defendant filed a suggestion of Buddy Worth's death, and plaintiff voluntarily substituted Barbara Kubach, Buddy Worth's legal representative. Kubach is hereby substituted as a party to this appeal. Thus, the style of this appeal has changed. Apart from this modification, our opinion remains the same and defendant's motion for reconsideration is denied.

DECIDED MARCH 18, 1994 —
RECONSIDERATION DENIED APRIL 1, 1994.

*Jones, Cork & Miller, Hubert C. Lovein, Jr., Howard J. Strickland, Jr.*, for appellant.
*Karen K. Daniels, Cooper & Rumsey, Lawrence A. Cooper*, for appellee.