A03A2262, A03A2263. ZIEVE et al. v. HAIRSTON; and vice versa.
(598 SE2d 25)

MILLER, Judge.

These consolidated cases arise out of Celento Hairston's lawsuit against Ronald Zieve and National Hair Transplant Specialists, Inc. for their unauthorized televising of Hairston's before and after hair replacement photographs. Following a jury verdict in favor of Hairston in the total amount of $365,000,[1] defendants appealed the trial court's order denying their motion for judgment notwithstanding the verdict. Hairston filed a cross-appeal of the trial court's order granting partial summary judgment to Zieve before trial and the trial court's partial grant of a directed verdict to Zieve during the trial. For the reasons that follow, we affirm.

Hairston claimed that contrary to their agreement with him, the defendants aired television commercials in Georgia that contained before and after pictures of Hairston's hair replacement treatments. Hairston's suit against the defendants asserted several theories of recovery in tort, as well as breach of contract. After a summary judgment ruling, the claims to be tried by a jury included Hairston's invasion of privacy claims that were based on (1) public disclosure of embarrassing facts about plaintiff and (2) appropriation of plaintiff's name or likeness for defendants' advantage, and Hairston's fraud claim that was based upon Zieve's representations in two telephone conversations, in which Zieve falsely claimed the television station no longer had the videotape of the advertisement.

During the trial, the court granted defendants' motion for a directed verdict on Hairston's breach of oral contract claim because he failed to prove its existence with specificity. The trial court also granted defendants' motion for a directed verdict on the invasion of

---

[7] See generally *In the Interest of E. G. W.*, supra.
[1] The jury awarded $250,000 in compensatory damages, $15,000 attorney fees, and $100,000 in punitive damages.

privacy claim (based upon appropriation) and on the attorney fees claim (based upon bad faith breach of contract). It allowed Hairston's remaining breach of written contract, invasion of privacy, and fraud claims (and corresponding claims for attorney fees and punitive damages) to be submitted to the jury.

In Case No. A03A2262, defendants contend the trial court erred by denying their motion for a directed verdict on Hairston's (1) remaining invasion of privacy claim based on public disclosure, (2) fraud claim based upon representations in two phone calls after the commercials began airing, (3) claim for attorney fees, and (4) claim for punitive damages. Defendants also contend that the compensatory damages award of $250,000 was excessive.

In Case No. A03A2263, Hairston contends the trial court erred by granting partial summary judgment to defendants on his fraud in the inducement claim, and also by directing a verdict in favor of defendants on his claims for breach of oral contract, invasion of privacy through appropriation, and attorney fees based on bad faith contract breaches.

### Case No. A03A2262

1. "[A] directed verdict is appropriate only if there is no conflict in the evidence as to any material issue and the evidence introduced, construed most favorably to the party opposing the motion, demands a particular verdict." (Citations omitted.) *St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136, 137 (1) (508 SE2d 646) (1998). Viewed in this light, the record shows that in 1996, Hairston (a resident of Georgia) sought treatment for baldness from defendants, specifically, surgery to transplant small amounts of his own hair follicles over time. Hairston described it as a process that was performed gradually so it would not be noticeable. He had three surgeries in 1996, one in 1997, one in 1998, and two in 1999.

Hairston testified that during these years he wore a hat as a MARTA bus driver so that no one at work would notice the changes to his hairline. He told no one other than his wife and children about the hair transplants. He told none of his friends and "wore a hat constantly" so that no one would notice. He testified that he kept his surgeries a secret, "[b]ecause it was nobody else's business. I didn't want anybody to know. It's not something that you are proud of. It's embarrassing, especially to certain people." He feared that if people found out about it, he "would become the butt of jokes" and "be ridiculed."

Every time Hairston went to get a transplant, Zieve would ask if he could use his before and after pictures, which Hairston initially refused. In February 1999, Hairston realized that he needed more

surgeries but could not afford them, so he agreed to allow defendants to use his photographs on a limited basis in exchange for three free surgeries. Hairston agreed that the before and after photographs taken by his doctor could be viewed in the clinic. He refused to allow the pictures to be placed in any brochures, as such brochures could be removed from the clinic and passed on to others.

In June 1999, Hairston and Zieve entered into a written agreement allowing defendants to use Hairston's photographs in a television advertisement in exchange for three more free surgeries. In this contract, Hairston restricted the use of his pictures to 500 miles outside the State of Georgia.

In early November 1999, Hairston learned that his photographs were used on a local Atlanta television station when someone called to tell him. The airing of this advertisement had begun in October. Hairston stayed up all night until he saw the advertisement for himself. He could not breathe when he saw it and thought he was having an anxiety attack. As soon as he learned about it, he called Zieve and asked him to stop the commercials. Zieve told him the television station made a mistake, that he would have them removed, and not to worry. When the commercials continued to run, Hairston kept calling Zieve, who kept promising to stop them. Zieve also laughed and told him, "You look great. Don't worry. I'll make you famous."

On November 11, Hairston called Zieve again because the ads had not stopped after he had been assured several times by Zieve that they would. Zieve promised again that the ads would stop running. He also stated that the ads had just started running and were only on one station (when in fact they had been running for weeks on two stations). As a result of Zieve's promises, Hairston "sat tight and didn't do anything" because he wanted to see whether Zieve would stop them.

When the ads continued, Hairston called Zieve again on November 16 and asked him to stop running the ads. Zieve told him the ad was running on only one television station and that it was the station's fault. When Hairston told Zieve how upset he was about the ads running, Zieve told him that he should be glad if Zieve made him famous, that he had nothing to be ashamed of, and that his hair looked great.

One or two nights later, Hairston saw another ad and called a vice-president at National Hair Transplant to complain. When he asked the vice-president why Zieve did this to him, he replied, "I don't know why [Zieve] does these things. He doesn't even need to do it." The vice-president also admitted that Zieve had done it before.

During the time that the commercials continued to air, more people found out about them; co-workers teased him and gave him the

nickname "HRS man." Distressed, Hairston took a week off from work without pay. Around this time, he was given an opportunity to choose another work location and he chose to do so even though it was a longer commute. Even after the ads stopped and he transferred locations, people still asked him about it and talked about it. Hairston also testified that he only received two free surgeries, instead of the promised six, because he felt unable to return to the defendants after they breached the contract. Using a different hair company, he had to fly to another location to receive additional treatments and pay a $500 fee for each one.

The vice-president testified that National Hair Transplant published Hairston's photographs in a brochure that was mailed to prospective clients. He also acknowledged that Hairston was "distraught" when he talked with him on the phone about the television ads and that he called the television station to have the ads removed after talking with Hairston.

A co-worker of Hairston testified that before seeing the commercial, he did not know that Hairston had undergone hair replacement surgery, even though he worked with Hairston every day. He also testified that Hairston's other co-workers knew about the commercials and kidded Hairston about them.

Zieve testified that he knew the commercial was running on two different television stations. He acknowledged that Hairston's call to the vice-president resulted in the immediate removal of the commercial from one station, that Hairston's phone call to him in early November did not result in the immediate pulling of the ads, and that he lied to Hairston about the ads running on only one station.

Zieve and National Hair Transplant contend the trial court should have granted their motion for a directed verdict on Hairston's invasion of privacy claim that was based upon public disclosure of embarrassing private facts. To establish this cause of action, a party must prove: (1) the disclosure of the private facts was a public one; (2) the facts disclosed were private, secluded, or secret facts; and (3) the matter made public was offensive and objectionable to a reasonable person of ordinary sensibilities under the circumstances. *Cabaniss v. Hipsley*, 114 Ga. App. 367, 372 (2) (151 SE2d 496) (1966).

Defendants contend the trial court should have granted their motion for a directed verdict on this theory of recovery because: (a) the facts disclosed were not private, secluded, or secret facts; (b) Georgia law does not recognize an invasion of privacy claim based on one's outward appearance; and (c) the matter made public was not offensive or objectionable to a reasonable person of ordinary sensibilities.

(a) Defendants claim the evidence fails to show that Hairston's hair replacement treatment was a private, secluded, or secret fact because (1) his treatment was not a secret fact since it would be

obvious to others, and (2) he waived any right to keep it secret by allowing his pictures to be used in the clinic and on television.

We disagree with the assertion that Hairston's treatment was not a private, secluded, or secret fact. Hairston testified that he told only his immediate family members about the treatment and that he wore a hat at all times to hide his treatment. A co-worker who saw him every day did not know that he had undergone hair replacement treatment until he saw the television ads. While his treatment could have been obvious to others, Hairston took steps to prevent this.

We also hold that Hairston did not waive his right to keep his treatment secret by consenting to advertising limited to the defendant's place of business and television stations 500 miles outside of Georgia. "[T]he protection afforded an individual's right to privacy may be waived or withdrawn to whatever degree and in whatever connection his life has ceased to be private." (Citation and punctuation omitted.) *Multimedia WMAZ, Inc. v. Kubach*, 212 Ga. App. 707, 709 (1) (443 SE2d 491) (1994). "[W]aiver in this context is a relative term: the scope of the waiver is related to and limited by the scope of the actions on which the waiver is based." Id.

In *Kubach*, we applied these principles to hold that an AIDS patient did not completely waive his right to privacy by disclosing his disease to family, friends, medical personnel, and a support group. As a result, he could recover against a television station that failed to digitally hide his identity in an AIDS program that it aired because the television station's disclosure was not similar in degree or context. Id. at 709-710 (1).

Here, as in *Kubach*, the defendants' disclosure "went far beyond the scope of any prior disclosure by plaintiff. . . ." Id. at 710 (1). Additionally, as in *Kubach*, there was an explicit agreement between the defendants and Hairston. In *Kubach*, the defendant agreed to keep the plaintiff's identity secret in the broadcast in order to secure his participation in the AIDS program. In this case, defendants agreed not to broadcast the commercial within a 500-mile radius of Georgia in order to secure Hairston's permission to use his photos in their commercial.

(b) Defendants' claim that Georgia law does not recognize invasion of privacy claims based on one's outward appearance simply states in a slightly different way their claim that Hairston's hair replacement treatment was not a private, secluded, or secret fact. Defendants cite no authority holding a right to privacy can never be based on one's outward appearance, and the record contradicts their assertion in their brief that "[t]here is no evidence he concealed his outward appearance." As we have previously noted, Hairston constantly wore a hat to conceal his hair replacement treatment from

those outside his immediate family, and one of his co-workers did not learn that he had received the treatment until the commercials aired.

(c) Defendants' final argument against Hairston's invasion of privacy recovery is based on their contention that the disclosure in this case was not offensive and objectionable to a reasonable person of ordinary sensibilities under the circumstances. In support of this argument, defendants assert that Georgia courts equate the "offensive and objectionable" element in an invasion of privacy claim with the "extreme and outrageous" element of an emotional distress claim. We disagree. The cases cited by defendants do not support their argument, and we decline to adopt this novel theory.

It is true that the right to privacy is qualified and that "there are some shocks, inconveniences and annoyances which members of society in the nature of things must absorb without the right to redress." (Citation and punctuation omitted.) *Thomason v. Times-Journal, Inc.*, 190 Ga. App. 601, 604 (4) (379 SE2d 551) (1989). After reviewing the evidence in this case, we hold that a jury could have found that the defendants' disclosure of Hairston's hair replacement treatment was one that a reasonable person of ordinary sensibilities would find offensive and objectionable under the circumstances. Indeed, defendants obtained Hairston's permission to use his photographs in a television commercial *only after* promising that it would not be shown within 500 miles of Georgia.

The trial court did not err in denying defendants' motion for a directed verdict on Hairston's public disclosure invasion of privacy claim.

2. In their second enumeration of error, defendants contend the trial court should have granted their motion for a directed verdict on Hairston's fraud claim. "The elements of a fraud action are an intentional false representation by the defendant designed to induce the plaintiff to act or refrain from acting, upon which the plaintiff justifiably relies, resulting in damage to the plaintiff." (Citation omitted.) *Kent v. A. O. White, Jr. &c., P.C.*, 238 Ga. App. 792, 793 (520 SE2d 481) (1999). The fraud theory was based on Zieve's representations in telephone conversations with Hairston that the commercials would stop running and that they had only run on one television station. Defendants contend the trial court should have granted their motion for a directed verdict because there was no evidence showing (a) that defendants intended to deceive Hairston, (b) that Hairston justifiably relied on defendants' representations, and (c) that actual damages resulted from the fraud alleged.

(a) We find no merit in defendants' claim that Hairston's fraud claim should have been removed from the jury's consideration based on his failure to prove their fraudulent intent. "Questions of fraud are, except in plain and indisputable cases, questions for the jury."

(Citation and punctuation omitted.) *Pecora v. First Bank of Ga.*, 217 Ga. App. 190, 191-192 (1) (457 SE2d 200) (1995); see also *Gunnin v. Dement*, 205 Ga. App. 631, 634 (422 SE2d 893) (1992) ("[T]he question of intent to deceive or not to perform is in all cases the dominion of the factfinder. . . .") (citations and punctuation omitted). Hairston submitted evidence that Zieve lied about the number of television stations, as well as how long the advertisements had aired, when Hairston talked with him after learning about the advertisements. Hairston also submitted evidence that the commercials did not stop airing when Zieve promised they would. This evidence was sufficient to submit the issue of intent to the jury.

(b) Defendants contend they were also entitled to a directed verdict on Hairston's fraud claim because he did not rely on Zieve's representations that the commercials would stop running. Hairston testified that he "sat tight" and "didn't do anything" for a few days after his first conversation with Zieve because he "wanted to see whether he was going to have it taken off." He testified that he subsequently hired an attorney to make Zieve stop running the commercials. Based on this evidence, the question of whether Hairston justifiably relied on Zieve's representations was for the jury to decide.

(c) Defendants assert Hairston's fraud claim was subject to a directed verdict because he failed to prove actual damages. In order to recover for fraud, a plaintiff must prove "that actual damages, not simply nominal damages, flowed from the fraud alleged." (Punctuation and footnote omitted.) *Moore-Davis Motors, Inc. v. Joyner*, 252 Ga. App. 617, 619 (2) (556 SE2d 137) (2001). "The expression 'actual damages' is not necessarily limited to pecuniary loss, or loss of ability to earn money." (Citation and punctuation omitted.) *Fuqua Television v. Fleming*, 134 Ga. App. 731, 734 (3) (215 SE2d 694) (1975). "General damages are those which the law presumes to flow from any tortious act, and they may be awarded on a fraud claim." (Footnote omitted.) *Economic Exterminators of Savannah v. Wheeler*, 259 Ga. App. 192 (1) (576 SE2d 601) (2003). "Wounding a man's feelings is as much *actual damage* as breaking his limbs." (Citations and punctuation omitted; emphasis in original.) *Fuqua Television*, supra, 134 Ga. App. at 734 (3); see also *Mallard v. Jenkins*, 186 Ga. App. 167, 168 (1) (366 SE2d 775) (1988). Injury to reputation is a personal injury, and personal injury damages can be recovered in a fraud action. See *Hamilton v. Powell, Goldstein, Frazer & Murphy*, 167 Ga. App. 411, 416 (2) (306 SE2d 340) (1983), aff'd, 252 Ga. 149 (311 SE2d 818) (1984); see also *Conner v. Hart*, 252 Ga. App. 92, 97 (2) (555 SE2d 783) (2001).

In this case, the additional embarrassment and ridicule suffered by Hairston as a result of the continued running of the commercials

was sufficient to submit the issue of actual damages to the jury. The trial court did not err by denying defendants' motion for a directed verdict on Hairston's fraud claim.

3. In their third enumeration of error, defendants assert that Hairston's claims for punitive damages and attorney fees fail if we hold a directed verdict should have been granted on his underlying tort claims for invasion of privacy and fraud. Our holdings in Divisions 1 and 2 render this enumeration of error moot.

4. Defendants request that we invalidate the jury's compensatory damage award of $250,000 because it is excessive. OCGA § 51-12-12 (a) provides:

> The question of damages is ordinarily one for the jury; and the court should not interfere with the jury's verdict unless the damages awarded by the jury are clearly so inadequate or so excessive as to be inconsistent with the preponderance of the evidence in the case.

A motion for new trial on the grounds that the verdict was excessive "addresses itself to the discretion of the trial judge who saw the witnesses and heard the testimony." (Citation and punctuation omitted.) *Atlanta Transit System v. Robinson*, 134 Ga. App. 170, 171 (1) (213 SE2d 547) (1975). On appeal, our inquiry is confined to the question of whether the trial court abused its discretion in denying a motion for a new trial on this ground. Id. We will not hold a new trial is warranted unless the jury's award "is so flagrantly excessive or inadequate, in light of the evidence, as to create a clear implication of bias, prejudice, or gross mistake on the part of the jurors." (Citations and punctuation omitted.) *Turpin v. Worley*, 206 Ga. App. 341, 343 (1) (425 SE2d 895) (1992). Indeed, it must be "so flagrant as to shock the conscience." (Citation and punctuation omitted.) Id.

As there is no evidence of such flagrancy, we hold the trial court did not abuse its discretion when it denied defendants' request to set aside the compensatory damages award.

5. In their final enumeration of error, defendants contend they were entitled to a directed verdict on Hairston's punitive damages claim because there was a lack of clear and convincing evidence to support it.

> Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which

would raise the presumption of conscious indifference to consequences.

OCGA § 51-12-5.1 (b).

> Something more than the mere commission of a tort is necessary for the imposition of punitive damages. Negligence alone, even gross negligence, is insufficient to support punitive damages. Punitive damages cannot be imposed without a finding of culpable conduct based upon either intentional or wilful acts, or acts that exhibit an entire want of care and indifference to consequences.

(Footnotes omitted.) *MDC Blackshear, LLC v. Littell,* 273 Ga. 169, 173 (4) (537 SE2d 356) (2000).

The jury in this case found the defendants committed fraud, an intentional tort for which punitive damages may be awarded. *Baker v. Campbell,* 255 Ga. App. 523, 530 (1) (c) (565 SE2d 855) (2002); see also *McDaniel v. Elliott,* 269 Ga. 262, 264-265 (2) (497 SE2d 786) (1998). Zieve admitted that he knew the commercials were running on two different television stations, that he lied to Hairston when he said they were running on only one station, that the commercials were not immediately stopped after he talked to Hairston, and that the commercials immediately stopped when Hairston talked with the vice-president. There was also evidence that Zieve laughed and told Hairston he would make him famous when Hairston confronted him about the commercials. Finally, the vice-president admitted to Hairston that Zieve had "done it before."

Since some clear and convincing evidence supports the jury's award of punitive damages, the trial court did not err by denying defendants' motion for a directed verdict on punitive damages.

### Case No. A03A2263

Hairston requested that we consider his cross-appeal only if defendants prevailed in their appeal. As we have affirmed the judgment in Hairston's favor in Case No. A03A2262, we need not consider the issues raised in Hairston's cross-appeal.

*Judgment affirmed in both cases. Smith, C. J., concurs. Ruffin, P. J., concurs in judgment only.*

DECIDED MARCH 12, 2004 —
RECONSIDERATION DENIED APRIL 5, 2004.

*Claxton & Claxton, William P. Claxton*, for appellants.
*Jennings, Sparwath & Satcher, Daniel M. Jennings*, for appellee.