## A05A1436. RIDDLE v. GOLDEN ISLES BROADCASTING, LLC.
(621 SE2d 822)

Ellington, Judge.

The Superior Court of Glynn County granted summary judgment to Golden Isles Broadcasting, LLC ("Golden Isles"), the company that owns the radio station Travis Riddle claims defamed him. Riddle appeals, contending the trial court erred in finding that he was a public figure, that the defamatory statement was made without actual malice, and that Golden Isles is shielded from liability under OCGA § 51-5-10. Because the trial court erred in concluding that Riddle was a public figure, and because material issues of fact remain for jury resolution, we must reverse.

"On appeal from the grant of summary judgment this Court conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." (Citation and punctuation omitted.) *Cox Enterprises v. Nix*, 274 Ga. 801, 804 (2) (560 SE2d 650) (2002). So viewed, the record reveals the following relevant, undisputed facts.

Radio station WSEG "Hot" 104.1 of Brunswick employed Antonio "Tone" Warrick as a disc jockey for a rap music show that aired daily from 7:00 p.m. to 10:00 p.m. The show featured music, not news. The radio station's broadcast range extends about 30 miles from its Brunswick tower. Warrick, who was acquainted with Travis Riddle and his family, played Riddle's rap music occasionally, including Riddle's recent hit "Daddy's Little Boy."

Riddle, who was pursuing a music career, had achieved a degree of notoriety in Brunswick, his hometown. A local newspaper had published one article about Riddle's music in January 2002. Riddle had performed in local rap concerts, had one guest appearance on MTV's "Say What Karaoke," had self-published one CD, and had accumulated profits of about $10,000. Nevertheless, neither the radio station's business manager nor an affiliate's program director had heard of Riddle until after the lawsuit was filed. At the time of the alleged defamation, Riddle was living in Atlanta and working as a banquet server.

On or about August 15, 2002, during his show, Warrick began receiving telephone calls from listeners who had heard rumors that Riddle murdered Josephine Howard, a woman who was Riddle's girlfriend and is the mother of his young son. After receiving ten or eleven of these calls, Warrick decided to put a caller on the air. He deposed that he aired only one call from an unidentified woman. He summarized their conversation like this:

A. She said — she asked me the question did Travis Riddle kill his wife, or his girl friend, Jody, I believe, and I said, no, I hadn't heard that, I didn't know anything about that, and I left it open and saved to another song, just to leave it open for the rest of the audience.

Warrick said the call was digitally recorded, but that the file was overwritten when he saved a later call from Riddle. Riddle called in to complain about the broadcast (which he did not hear), and his call was recorded, aired, and later transcribed.

Riddle told Warrick he was aware of the rumored murder of his girlfriend. He explained that the rumor was a misunderstanding that arose from a domestic dispute and that his girlfriend was, in fact, alive. Riddle said the rumor started when his girlfriend failed to appear at work and her mother filed a missing persons report. Riddle blamed the rumors on his girlfriend (who was "teach[ing him] a lesson") and his girlfriend's mother. The transcript of the on-air interview and Riddle's deposition suggest that, prior to the broadcast, the police may have investigated Howard's disappearance. The record, however, is devoid of information from news or law enforcement sources confirming the existence of either a missing persons investigation or a murder investigation. Howard, according to her own affidavit, is alive.

Riddle submitted several affidavits from people who claim to have heard the broadcast. They recounted hearing one or more reports that Riddle had killed Howard and that the police were looking for her body. Some also reported hearing Riddle's follow-up denial. Riddle's mother said she heard a male broadcaster say: "Slim Riddle, a local rapper, has just murdered Josephine Howard." Riddle's mother and Howard both stated that for some time after the broadcast, the rumors of the alleged murder persisted. One affiant, a record producer, stated that he decided not to produce an album for Riddle because of the rumors broadcast by the radio station.

Riddle sued Golden Isles for defamation. Golden Isles moved for summary judgment, contending, among other things, that Riddle "is a public figure who cannot demonstrate that Defendant acted with actual malice." In ruling on the motion, the trial court concluded that Riddle was a public figure because he had "expressed his desire to be a recording artist, he had performed regularly in that capacity, and he believed his music conveyed an important message to society." Riddle contends the trial court erred in finding that he was a public figure. He also contends the trial court erred in resolving factual

disputes and witness credibility when it concluded the station was not liable under OCGA § 51-5-10 for defamatory remarks uttered by an unidentified caller.

1. *Riddle's status.* The key issue in this appeal is whether Riddle is a private or a public figure. "This is a critically important issue, because in order for a public figure to recover in a suit for defamation, there must be proof by clear and convincing evidence of actual malice on the part of the defendant. Plaintiffs who are private persons must only prove that the defendant acted with ordinary negligence." (Punctuation and footnotes omitted.) *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 816-817 (3) (555 SE2d 175) (2001). Although the trial court concluded Riddle was a public figure, it did not specify whether Riddle was a general or limited purpose public figure.[1] Whether "a person is a public figure, general or limited, is a question of law for the court to resolve." (Footnote omitted.) Id. at 817. Consequently, we must determine whether the record supports a finding that Riddle was a public figure under either analysis.

As we have held,

> [t]hose who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures. Further, that designation (public figure) may rest on either of two alternative bases. In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions. . . . [These persons] include artists, athletes, business people, dilettantes, anyone who is famous or infamous because of who he is or what he has done.

(Citation and punctuation omitted.) *Williams v. Trust Co.*, 140 Ga. App. 49, 52-53 (II) (230 SE2d 45) (1976).

---

[1] While seeming to imply that Riddle was a general purpose public figure, the court cited a case that held public figures are "individuals who are 'intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.'" This quote is from *Mathis v. Cannon*, 276 Ga. 16, 21-22 (3) (573 SE2d 376) (2002), a case that analyzed whether a person was a limited purpose public figure. Id. at 23-25.

(a) *General purpose public figure.*

"Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." *Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 352 (V) (94 SC 2997, 41 LE2d 789) (1974). A person is a general purpose public figure "only if he is a 'celebrity[,]' his name a 'household word' whose ideas and actions the public in fact follows with great interest." *Waldbaum v. Fairchild Publications*, 627 F2d 1287, 1292 (III) (D.C. Cir. 1980). In determining whether a plaintiff has achieved the degree of notoriety and influence necessary to become a public figure in all contexts, a court may look to several factors that existed before the alleged defamation was published. Id. at 1295.

> The judge can examine statistical surveys, if presented, that concern the plaintiff's name recognition. Previous coverage of the plaintiff in the press also is relevant. The judge can check whether others in fact alter or reevaluate their conduct or ideas in light of the plaintiff's actions. He also can see if the plaintiff has shunned the attention that the public has given him and determine if those efforts have been successful. At all times, the judge should keep in mind the voluntariness of the plaintiff's prominence and the availability of self-help through press coverage of responses in other words, whether the plaintiff has assumed the risk of reputational injury and whether he has access to the media. No one parameter is dispositive; the decision still involves an element of judgment. Nevertheless, the weighing of these and other relevant factors can lead to a more accurate and a more predictable assessment of a person's overall fame and notoriety in the community.

(Footnotes omitted.) Id.

Viewed in the light most favorable to Riddle as the nonmovant, the evidence of Riddle's celebrity is far from clear. While Riddle may have enjoyed some popularity among Brunswick rap music fans, he was not a household name. Golden Isles' own station managers had not heard of him. Riddle had produced little income from his performances and was very early in the process of seeking investors. The appellate record contains only one local newspaper article, a brief feature about Riddle's music. At the time of the alleged defamation, Riddle was living in Atlanta and working as a banquet server. While Riddle may have been gaining some popularity in local music circles, the evidence does not demonstrate that he had achieved the degree of celebrity and influence typical of a general purpose public figure. See *Gertz v. Robert Welch, Inc.*, 418 U. S. at 351-352 (although plaintiff

was "well known in some circles," served as officer of local civic groups, and had published several books and articles, he had not achieved general fame in the community sufficient to consider him a public figure); *Tavoulareas v. Piro*, 817 F2d 762, 772 (II) (D.C. Cir. 1987) (although the plaintiff was a highly prominent individual, especially in business circles, his celebrity in society at large did not approach the archetype of a general purpose public figure, such as a well-known entertainer or athlete); *Blue Ridge Bank v. Veribanc, Inc.*, 866 F2d 681, 687 (III) (4th Cir. 1989) (although plaintiff occupied a position of importance in the economy of its county, it lacked the widespread power or pervasive influence necessary to affect the resolution of public issues sufficient to elevate it to a general purpose public figure). Thus, the record does not support a finding that Riddle was a general purpose public figure.

(b) *Limited purpose public figure.*

In *Mathis v. Cannon*, 276 Ga. 16, 23 (3) (573 SE2d 376) (2002), the Supreme Court of Georgia adopted the Eleventh Circuit's three-prong test in *Silvester v. American Broadcasting Cos.*, 839 F2d 1491, 1494 (11th Cir. 1988), to determine whether a person is a limited purpose public figure. "Under this analysis, a court must isolate the public controversy, examine the plaintiff's involvement in the controversy, and determine whether the alleged defamation was germane to the plaintiff's participation in the controversy." *Mathis v. Cannon*, 276 Ga. at 23 (3).

The lower court failed to identify a public controversy in this case — the first and most fundamental step in determining whether a person is a limited purpose public figure. See *Mathis v. Cannon*, 276 Ga. at 23 (3).

> [A] public controversy must be more than merely newsworthy. In addition, the public controversy must not be an essentially private concern such as divorce. If it is evident that resolution of the controversy will affect people who do not directly participate in it, the controversy is more than merely newsworthy and is of legitimate public concern. In short . . . if the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.

(Citations and punctuation omitted.) *Silvester v. American Broadcasting Cos.*, 839 F2d at 1494-1495.

There is no evidence in the record that Riddle was named a suspect in a murder investigation. In fact, there was no murder. Riddle became the subject of local gossip and speculation based upon the temporary disappearance of his ex-girlfriend. While Howard's

disappearance might have been newsworthy, there is no evidence that it was actually publicized in the media. Further, while the resolution of Howard's disappearance might have affected Howard's friends and family and the local law enforcement personnel who directly participated in that matter, it had no ramifications for the general public. Thus, there is no evidence that any investigation was "already the subject of debate in the public arena," (citation and footnote omitted), *Atlanta-Journal Constitution v. Jewell*, 251 Ga. App. at 817 (3) (a), or that "resolution of the controversy will affect people who do not directly participate in it." *Silvester v. American Broadcasting Cos.*, 839 F2d at 1494-1495 (II) (B). Because there was no public controversy, the record does not support a finding that Riddle was a limited purpose public figure.

Because Riddle is not a public figure, he is not required to prove that Golden Isles acted with actual malice in broadcasting the alleged defamatory statements. As a private person, he need only produce evidence from which a jury could infer that Golden Isles acted with ordinary negligence. See *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. at 816-817. Therefore, the court erred in granting summary judgment on this basis.

2. Riddle contends the trial court erred in concluding that Golden Isles was not liable for the rumors spread by the unknown female caller because the station acted with due care, as required by OCGA § 51-5-10 (a), to prevent the unknown caller from uttering the defamatory remarks.[2] We agree that by making this finding, the court improperly weighed witness credibility and resolved issues of fact. Given the affidavit evidence adduced, a jury could infer that Warrick, not the unknown caller, defamed Riddle by stating that Riddle had committed a murder.[3]

---

[2] OCGA § 51-5-10 (a) provides:
    (a) The owner, licensee, or operator of a visual or sound broadcasting station or network of stations and the agents or employees of any owner, licensee, or operator shall not be liable for any damages for any defamatory statement published or uttered in or as a part of a visual or sound broadcast by one other than the owner, licensee, or operator or an agent or employee thereof, unless it is alleged and proved by the complaining party that the owner, licensee, operator or the agent or employee has failed to exercise due care to prevent the publication or utterance of the statement in the broadcast.

[3] We have held that defamation via a radio or television broadcast (or a "defamacast," as it has become known) includes elements of both libel under OCGA § 51-5-1 and slander under OCGA § 51-5-4. *Strange v. Henderson*, 223 Ga. App. 218, 219 (477 SE2d 330) (1996). Libel is a "false and malicious defamation of another . . . tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." OCGA § 51-5-1 (a). According to OCGA § 51-5-4 (a) (1), slander or oral defamation includes, "[i]mputing to another a crime punishable by law."

The trial court considered the various affidavits and found that "none of them attribute conduct to the Defendant's employee which would arguably be more defamatory than the version of events proffered by Defendant, except the affidavits of Plaintiff's mother and [Steven] Quick." The court concluded that Riddle's mother's affidavit was entirely hearsay and thus had no probative value. Although her affidavit does contain some hearsay, this part is plainly based upon the affiant's personal knowledge: "I heard the tail-end of a broadcast saying 'Slim Riddle, a local rapper, has just murdered Josephine Howard. . . .' I remember those exact words being broadcast. It was a male DJ's voice that I heard and not some female caller." This statement gives rise to an inference that Warrick — an employee of Golden Isles — defamed Riddle by accusing him of murder. Quick, who also attributed the broadcast to Warrick, claims he heard "D. J. Tone" say that Riddle was being "looked for, for the murder of his son's mother." The court dismissed Quick's statement, finding that it was not false because it was consistent with Riddle's own account "that a missing person report had been filed on his son's mother." However, we cannot agree that Quick's affidavit is subject to only that interpretation. A jury could also infer from Quick's affidavit that he heard Warrick say Riddle was wanted for murder. Moreover, there are at least seven other affidavits in which listeners recount hearing "reports" that Riddle "killed" Howard. They do not use the word "rumor" or suggest that the question of Riddle's involvement or guilt, as Warrick put it, was left "open for the rest of the audience." Consequently, whether Golden Isles' version of the broadcast was true remains disputed. Further, because the identity of the person who uttered the alleged defamation is also disputed, Golden Isles cannot rely on OCGA § 51-5-10 (a) as a basis for summary judgment. That statute only shields a broadcaster from liability for those defamatory statements uttered "by one *other than* the owner, licensee, or operator or an agent or employee thereof." (Emphasis supplied.) Id.

For these reasons, the trial court erred in granting summary judgment to Golden Isles.

*Judgment reversed. Smith, P. J., and Adams, J., concur.*

DECIDED OCTOBER 4, 2005.

*Vincent D. Sowerby*, for appellant.
*Ruberti & Ruberti, E. Michael Ruberti*, for appellee.