A06A1362. TORRANCE v. MORRIS PUBLISHING GROUP, LLC et al.
A06A1363. TORRANCE v. AYENI.

(636 SE2d 740)

MIKELL, Judge.

In these related appeals involving an action for libel, defamation, and invasion of privacy, we affirm the grant of summary judgment to all defendants and the order denying plaintiff's motion to remand the case to Toombs County. The relevant facts follow.

The underlying action arose out of the publication of a series of articles entitled "Justice Betrayed" by the Savannah Morning News in 2003. The articles questioned circumstances surrounding the 1997 death of Henry Dickerson, Jr., a 28-year-old African-American, in Vidalia, and the ensuing investigation by the police and the Georgia Bureau of Investigation ("GBI"). Dickerson, a convicted peeping Tom, was found dead at the bottom of a pool at the home of Vidalia's city attorney, Reid Threlkeld, on April 28, 1997. According to the articles, the police concluded that Dickerson was peeping through a window at Threlkeld's teenaged daughter, when, "with his pants and underwear around his ankles," Dickerson suffered a cocaine-induced heart spasm, stumbled 12 feet across the yard, and fell into the pool. The previous night, William Torrance, Vidalia's city manager and plaintiff S. T.'s father, had scared away an individual believed to be Dickerson from outside of S. T.'s window. S. T. was 17 years old at the time, and she reportedly had heard someone trying to open her window.

Vickey Horton Tapley, a GBI agent assigned to investigate Dickerson's death,[1] included the following passage in her report: "The bedroom window of where the initial call came in was said to be nailed shut secondary to the girl letting boys in her window. The window of the residence where the decedent was found was said to be sealed secondary to being painted."

---

[1] The Superior Court of Richmond County, which issued the orders that are the subject of these appeals, described "Justice Betrayed," and Tapley's role, as follows:

The series had to do with a thwarted GBI investigation of drug use, alleged unlawful recording and dissemination of a GBI agent's [Tapley's] cellular telephone calls, her federal case against city officials, the mysterious death of a young black man whose body was found in the swimming pool of the city attorney, and belief by some that the deceased had been outside the window of the city manager's daughter on the night before he died.

The first installment of the four-part series, published in the Savannah Morning News on February 27, 2003, reported the information as follows:

> Tapley wrote in her report that the window outside Torrance's daughter's room had been nailed shut because she let boys in through it. The daughter told police that she heard someone trying to enter through the window — not passively peeping — even though her parents were awake in the bedroom next door. Did Dickerson and the daughter know each other? No, the daughter told investigators.

The second article, published on the following day, continued as follows:

> The city manager said it was unlikely the prowler could have entered his daughter's room because her window was painted shut. But in a report to a Crime Lab investigator, Tapley reported that the girl's window had been nailed shut to prevent her from letting people into her room. Torrance said he had no idea where Tapley got that information.

Based on these articles, S. T. filed an action against the owner and publisher of the Savannah Morning News, its managing editor, and the reporters who wrote the articles ("the Newspaper defendants"),[2] as well as Jackie Ayeni, the Vidalia police officer who investigated the incident at S. T.'s window. Suit was filed on February 5, 2004, in the Superior Court of Toombs County, where Ayeni then resided. No other defendant resided or maintained a place of business in that county.

In the complaint, S. T. claimed that "[o]ne of the false but clearly intended messages of the . . . series was that, based on an untruth that the window into Plaintiff's room had to be nailed shut because she let boys in through it, Plaintiff possibly knew and/or had a relationship with [Dickerson]." S. T. alleged that by publishing false statements and her picture, the Newspaper defendants had defamed her and invaded her privacy by portraying her in a false light. S. T. further alleged that Ayeni provided false information to the reporters who

---

[2] The Newspaper defendants include: Daniel Suwyn, managing editor; Tuck Thompson and Bret Bell, reporters; Morris Publishing Group, LLC; Morris Communications Company, LLC; Morris Communications Holding Company, LLC; Southeastern Newspapers Corporation; and Southeastern Newspapers Company, LLC.

wrote the articles, knowing that the information would be published, and with intent to injure and defame S. T.[3]

In their responsive pleading, the Newspaper defendants asserted as an affirmative defense that jurisdiction and venue were not proper in Toombs County. In her answer, Ayeni asserted that the statute of limitation had expired on any claim against her. Thereafter, all defendants removed the action to Richmond County pursuant to OCGA § 14-2-510 (b) (4), which provides that in tort actions, a corporation is subject to venue in the county where the cause of action originated, but "[i]f venue is based solely on this paragraph, the defendant shall have the right to remove the action to the county . . . where the defendant maintains its principal place of business." Attached to the notice of removal is an affidavit showing that the principal place of business and registered agent for service of each Newspaper defendant is in Richmond County and that no such defendant had an office or place of business in Toombs County. The notice further stated that S. T. had not alleged any joint tortfeasor relationship between the Newspaper defendants and Ayeni in order to establish venue in Toombs County, and in any event, S. T.'s claims against Ayeni were barred by the statute of limitation.

Thereafter, S. T. amended her complaint to allege that all defendants were joint tortfeasors because they conspired to defame her, such that venue was proper in Toombs County. S. T. also filed a motion to remand the action to Toombs County. The Superior Court of Richmond County (the "trial court") denied the motion to remand, finding that the Newspaper defendants had no office in Toombs County and that the action against Ayeni was time-barred. The Newspaper defendants then moved for summary judgment, and the trial court granted the motion. Ayeni also filed a motion to dismiss or for summary judgment based on the expiration of the statute of limitation, and the trial court granted the motion. In Case No. A06A1362, S. T. appeals the orders denying her motion to remand and granting summary judgment to the Newspaper defendants. In Case No. A06A1363, S. T. appeals the order dismissing her action against Ayeni. Because the ruling on Ayeni's statute of limitation defense affects the ruling on the motion to remand, we first consider Case No. A06A1363.

---

[3] The complaint alleges that Ayeni told the reporters that S. T.'s father would rake the ground outside S. T.'s window for footprints.

## Case No. A06A1363

1. S. T. contends that the trial court erred in granting summary judgment to Ayeni based on the expiration of the one-year statute of limitation applicable to actions for injuries to the reputation, OCGA § 9-3-33. Because the issue was properly resolved by motion for summary judgment,[4] our review is de novo, and the evidence, and all reasonable conclusions and inferences drawn from it, are viewed in the light most favorable to the nonmovant.[5]

So viewed, the evidence conclusively demonstrates that S. T.'s claims against Ayeni are time-barred. As noted above, S. T. originally claimed Ayeni defamed her; S. T. subsequently amended her complaint to allege that the defendants conspired to defame her and that they invaded her privacy by placing her "in a false light in the public eye." One of the authors of the articles, reporter and defendant Bret Bell, submitted an affidavit stating that he and/or fellow reporter Tuck Thompson interviewed Ayeni on or about June 20, 2002, and July 25, 2002, and that these were the only occasions on which either reporter obtained any substantive information related to S. T. or her father. The articles were published beginning on February 27, 2003, and the complaint was filed on February 4, 2004.

OCGA § 9-3-33 states, in relevant part, that "[a]ctions for injuries to the person shall be brought within two years after the right of action accrues, except for injuries to the reputation, which shall be brought within one year after the right of action accrues." S. T. contends that her claims against Ayeni accrued when the newspaper articles were published in the Savannah Morning News. On the contrary, under OCGA § 51-5-3, "[a] libel is published as soon as it is communicated to any person other than the party libeled." This is true "regardless of whether or not plaintiff had knowledge of the act or acts at the time of their occurrence."[6] And the one-year limitation period applies to claims of libel and "false light" invasion of privacy,[7] as well as conspiracy to libel and slander.[8] Thus, in the case at bar, S. T.'s claims against Ayeni accrued no later than July 25, 2002, the date of her last communication with the Newspaper defendants.

---

[4] *Dept. of Human Resources v. Nation*, 265 Ga. App. 434, 439 (3) (594 SE2d 383) (2004) ("statute of limitation goes to the merits of a recovery and is a proper issue for disposition by motion for summary judgment") (citation, punctuation and footnote omitted).

[5] See *Rabun v. McCoy*, 273 Ga. App. 311 (615 SE2d 131) (2005).

[6] (Citation and punctuation omitted.) *Davis v. Hosp. Auth. of Fulton County*, 154 Ga. App. 654, 656 (3) (269 SE2d 867) (1980).

[7] *McCandliss v. Cox Enterprises*, 265 Ga. App. 377, 380 (2) (593 SE2d 856) (2004).

[8] *Lee v. Gore*, 221 Ga. App. 632, 635 (2) (472 SE2d 164) (1996), citing *Davis*, supra at 655 (3).

Since suit was not filed against her until more than one year later, summary judgment was properly granted in her favor.

S. T. advances several theories in support of her position that her claims against Ayeni accrued when the newspaper articles were published, but none is persuasive. S. T. first urges that we follow the Restatement (Second) of Torts, § 577, comment f, which states:

> One is liable for the publication of defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter. . . . The fact that the defamatory words are spoken with the intention that they be immediately embodied in a physical form makes the speaking not only the publication of a slander but a libel as well, provided they subsequently are so embodied.[9]

But S. T.'s position is not supported by the Restatement because there is no evidence in the record that Ayeni directed or procured the reporters to record and publish her comments. Moreover, the reference in the comment to "the speaking" as "the publication of a slander [and] a libel as well" is consistent with Georgia law. "Under OCGA § 9-3-33, a party has one year from the date that the slanderous statement is uttered or published to bring suit."[10]

Next, S. T. argues that the limitation period for conspiracy to defame should run from the date of the publication of the articles, because the publication was the object of the conspiracy. Case law does not support this position. In *Barnwell v. Barnett & Co.*,[11] we stated that "a claim for slander or conspiracy to slander remains a claim for injury to reputation subject to the one-year statute of limitation."[12] In *Lee v. Gore*,[13] we similarly stated: "It is well established that claims for slander, libel and conspiracy to libel and slander involve injuries to the reputation and not injuries to the person."[14] S. T.'s claim of conspiracy to defame is indistinguishable from the conspiracy claims asserted in *Barnwell* and *Lee*, and is likewise time-barred.

Finally, S. T. argues that her claim for invasion of privacy is an action for injury to her person, and so is subject to the two-year

---

[9] Restatement (Second) of Torts, § 577, comment f.

[10] (Citation omitted.) *McGee v. Gast*, 257 Ga. App. 882, 883-884 (2) (572 SE2d 398) (2002).

[11] 222 Ga. App. 694 (476 SE2d 1) (1996).

[12] (Citation omitted.) Id. at 695-696 (2).

[13] Supra.

[14] Id. at 635 (2).

limitation period in OCGA § 9-3-33. S. T. relies on *Hudson v. Montcalm Publishing Corp.*[15] and *Multimedia WMAZ v. Kubach*,[16] but these cases are inapposite. *Hudson* involved publication of a nude picture of the plaintiff without her consent, and she sought damages for injury to her person, not to her reputation, so we held that the two-year statute of limitation applied.[17] *Kubach* involved public disclosure of embarrassing private facts, which is a different type of invasion of privacy than the "false light invasion of privacy" for which S. T. seeks recovery.[18] "The false light cases obviously differ from those of intrusion, or disclosure of private facts. The interest protected is clearly that of reputation."[19] Therefore, S. T.'s invasion of privacy claim is solely one for injury to reputation, and the trial court correctly ruled that it is barred by the one-year statute of limitation.

## Case No. A06A1362

2. S. T. contends that the trial court erred in denying her motion to remand the action to Toombs County because venue was properly laid there. She argues that venue was not based "solely" on OCGA § 14-2-510 (b) (4), so that the Newspaper defendants did not have the right to remove the action to Richmond County, where they maintain their principal place of business. We disagree.

First, it is undisputed that Ayeni was the only defendant who resided in Toombs County. Venue in Toombs County "vanished" when Ayeni was granted summary judgment,[20] so S. T. cannot rely on the joint tortfeasor venue provision of the state constitution,[21] which permits a suit against joint tortfeasors residing in different counties to be brought in any county where one of them resides, to establish venue in Toombs County against the Newspaper defendants.

Thus, the issue is whether the trial court correctly determined that the Newspaper defendants did not have an office in Toombs County so as to preclude venue there pursuant to OCGA § 14-2-510 (b) (3), which provides, in relevant part, that in tort cases, "[e]ach domestic corporation . . . authorized to transact business in this state shall be deemed to reside and to be subject to venue . . . in the county where the cause of action originated, if the corporation has an office

---

[15] 190 Ga. App. 629 (379 SE2d 572) (1989).

[16] 212 Ga. App. 707 (443 SE2d 491) (1994).

[17] *Hudson*, supra at 633-634 (3).

[18] *Kubach*, supra at 708-709 (1).

[19] (Citation and punctuation omitted.) *Cabaniss v. Hipsley*, 114 Ga. App. 367, 375 (3) (151 SE2d 496) (1966).

[20] See *Collipp v. Newman*, 217 Ga. App. 674, 675 (458 SE2d 701) (1995).

[21] Ga. Const. of 1983, Art. VI, Sec. II, Par. IV.

and transacts business in that county." As relevant here, "venue of a civil action for libel against a corporate publisher [may] be laid in any county in which the newspaper is circulated, provided the corporation has an office and transacts business in that county."[22] Whether a corporation has an office and transacts business in a particular county is a mixed question of law and fact.[23] The trial court's findings of fact are reviewed under the "any evidence" standard and "will be reversed only where the evidence demands a contrary finding."[24] In the case at bar, the trial court found that

> the Savannah Morning News delivers its newspapers in bulk . . . to a shopping center parking lot in Toombs County. The newspapers are picked up there by independent contract carriers who distribute the papers to homes . . . and also to news racks that are owned by the Savannah Morning News, but rented by the independent carriers. . . . [A] regional circulation manager, who lives in an adjoining county, comes to Toombs County from time to time to recruit and train new contract carriers, to deliver supplies, and to pick up some of the subscription revenues.

Based on these facts, which S. T. apparently does not dispute, the trial court concluded that, although the Newspaper defendants transact business in Toombs County, they do not maintain an office there. This Court has consistently defined an "office" for the purposes of OCGA § 14-2-510 (b) (3) as "any place where a particular kind of business is transacted."[25] S. T. has cited no authority for the proposition that news racks are an "office" as defined under Georgia law. Moreover, cases cited by S. T. are inapposite.[26] Accordingly, the trial

---

[22] (Citations omitted.) *Carroll City/County Hosp. Auth. v. Cox Enterprises*, 243 Ga. 760, 761 (256 SE2d 443) (1979).

[23] *McLendon v. Albany Warehouse Co.*, 203 Ga. App. 865, 868 (2) (418 SE2d 130) (1992).

[24] Id. at 866 (1).

[25] (Citations omitted.) Id. at 868 (2); *Scott v. Atlanta Dairies Corp.*, 239 Ga. 721, 722-723 (1) (238 SE2d 340) (1977) (corporation rented and equipped a building in Putnam County; building was an "office" so venue was properly laid there); *Gen. Reduction Co. v. Tharpe*, 11 Ga. App. 334, 336-337 (75 SE 339) (1912) (mining corporation held subject to suit in a county where it maintained a plant).

[26] *McLendon*, supra at 868 (2) (a warehouse operated by a commissioned agent in Calhoun County was an "office"); *Chrysler Credit Corp. v. Brown*, 198 Ga. App. 653, 655 (2) (402 SE2d 753) (1991) (car dealership performed business functions for credit company, so credit company was deemed to have an office in county where dealership was located); *Musgrove v. Kirksey Ford Sales*, 159 Ga. App. 276, 278 (283 SE2d 292) (1981) (same); *Gillis v. Orkin Exterminating Co.*, 155 Ga. App. 804, 805-806 (272 SE2d 728) (1980) (Orkin paid monthly fee to local hardware store to answer Orkin's phone and take messages).

court did not err in concluding that venue was improper in Toombs County under OCGA § 14-2-510 (b) (3).

S. T. argues that venue was also based on OCGA § 14-11-1108 (b), since some of the defendants were limited liability companies, and not corporations. This argument fails, however, because OCGA § 14-11-1108 (b) provides that "[f]or purposes of determining venue, the residence of a limited liability company . . . shall be determined in accordance with Code Section 14-2-510 as though such limited liability company . . . were a corporation." Therefore, venue was solely based on OCGA § 14-2-510 (b) (4), and removal was proper.[27]

3. S. T. next argues that the trial court erred in granting summary judgment to the Newspaper defendants. As stated above, our review on appeal from a grant of summary judgment is de novo, and we view the evidence, and all reasonable conclusions and inferences drawn from it, most favorably to S. T., as the nonmovant.[28] So viewed, we conclude that no genuine issue of material fact remains on her claims for libel and invasion of privacy.

(a) *Libel.* S. T. argues that the articles were libelous because they falsely reported that her window had to be nailed shut to prevent her from letting boys in her room.[29] Because the statement was privileged and S. T. did not come forward with evidence of malice, however, we affirm the grant of summary judgment to the Newspaper defendants on this claim.

Newspaper libel is "[a]ny false and malicious defamation of another in any newspaper, magazine, or periodical, tending to injure the reputation of the person and expose him to public hatred, contempt, or ridicule."[30] A conditional privilege applies to "[t]ruthful reports of information received from any arresting officer or police authorities."[31] It is undisputed that the information gleaned from Tapley's report was information received from a police authority. S. T. argues that the articles are not privileged because they are not substantially accurate accounts of the contents of Tapley's report. She contends that the information as published in the articles was

---

[27] Compare *Mohawk Indus. v. Clark*, 259 Ga. App. 26, 27 (576 SE2d 16) (2002) (removal improper because venue did not depend "solely" upon the location of the accident as required under OCGA § 14-2-510 (b) (4); Mohawk had a plant and transacted business in county from which case was removed).

[28] *Rabun*, supra.

[29] S. T. initially contends in her brief that the articles were libelous for a second reason, that is, because they falsely reported that she knew Dickerson, but she does not argue how the statement defamed her. Rather, it appears from the trial court's order and appellant's brief that this statement may relate to pending litigation brought by S. T.'s father, William Torrance. Therefore, we do not address any claim related to this statement.

[30] OCGA § 51-5-2 (a).

[31] OCGA § 51-5-7 (8).

not "truthful" because it said that S. T.'s window "had been nailed shut," while Tapley's report stated that the window was "said to be nailed shut." The Newspaper defendants argue that this minor discrepancy is not sufficient to deprive the articles of their privilege.

"While generally the issue [of] whether privilege exists is for the jury, summary judgment is proper where defendant establishes as a matter of law that he made privileged statements."[32] To be a "truthful report" and so privileged under OCGA § 51-5-7 (8), the articles must have been a "fair and honest report of information obtained from police records and police authorities."[33] "As long as the facts are not misstated, distorted or arranged so as to convey a false and defamatory meaning, there is no liability for a somewhat less than complete report of the truth."[34]

In the case at bar, the statements in the articles concerning S. T.'s window fairly and honestly reported the information contained in Tapley's report. The articles were fair because they correctly reported that GBI agent Tapley's report contained information that S. T.'s window was nailed shut due "to the girl letting boys in her window" and that S. T.'s father denied that the window was nailed shut. The articles were honest because Tapley's report actually did contain information that S. T.'s window had been nailed shut to keep her from letting boys into her room.[35] The discrepancy between the report and the article as to whether the window had been nailed shut or was said to be nailed shut is immaterial.[36] "Although it must be accurate, at least with regard to all material matters, a substantially accurate report may be privileged, as mere inaccuracies not affecting materially the purport of the article are immaterial."[37] The Newspaper defendants therefore established as a matter of law that the articles were privileged reports of information received from police authorities pursuant to OCGA § 51-5-7 (8).

Finally, although S. T. correctly notes that the conditional privilege afforded by OCGA § 51-5-7 (8) is abrogated by actual malice,[38] we hold that the Newspaper defendants have borne their burden on summary judgment of negating this element of S. T.'s claim.

---

[32] (Citation omitted.) *Hyre v. Paxson*, 214 Ga. App. 552, 555 (5) (449 SE2d 120) (1994).

[33] *Davis v. Macon Telegraph Publishing Co.*, 93 Ga. App. 633, 639 (4) (92 SE2d 619) (1956), citing *Edmonds v. Atlanta Newspapers*, 92 Ga. App. 15, 20 (2) (87 SE2d 415) (1955).

[34] (Citations and punctuation omitted.) *Lawton v. Ga. Television Co.*, 216 Ga. App. 768, 771 (1) (456 SE2d 274) (1995).

[35] S. T. asserted, both in her complaint and her deposition, that Tapley's statements that S. T.'s window was nailed shut and that she let boys into her room were false.

[36] Id.

[37] (Citation and punctuation omitted.) Id.

[38] See OCGA § 51-5-9; *Davis v. Macon Telegraph Publishing Co.*, supra at 637 (3); *Edmonds*, supra at 20 (2).

Although the burden is on the plaintiff at trial to prove actual malice, when a defendant moves for summary judgment, it "must negate a plaintiff's claim of actual malice by establishing that it lacked knowledge that the defamatory matter was false or did not publish it with reckless disregard as to whether it was false or not."[39]

Here, reporter Bell submitted an affidavit stating that he did not know or suspect that the GBI report in question was erroneous; that he and Thompson interviewed S. T.'s father, who stated that the window was painted shut, not nailed shut; that both accounts were published because either or both could have been correct; and that there was no statement in the series of articles which either reporter suspected was false with respect to S. T. S. T. did not come forward with evidence of malice so as to create a jury issue on this claim. It follows that the trial court did not err in granting summary judgment to the Newspaper defendants on the issue of libel.

(b) *Invasion of Privacy.* There are four species of the tort of invasion of privacy: "(1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3) publicity which places the plaintiff in a false light in the public eye; (4) appropriation, for the defendant's advantage, of the plaintiff's name or likeness."[40] Here, S. T. claims that the publication of her photograph and the information about her window constituted the third type, known as "false light" invasion of privacy. To establish this claim, a plaintiff must show "the existence of false publicity that depicts [her] as something or someone which she is not [and] must demonstrate that the false light in which she was placed would be highly offensive to a reasonable person."[41] S. T. argues that summary judgment should not have been granted on this claim because the articles portrayed her as promiscuous, which she is not, and that such a mischaracterization is highly offensive to a reasonable person.

Even assuming, arguendo, that the articles painted S. T. in a false light, she cannot recover on this claim. "[T]he right to recover under an invasion of privacy theory is restricted where matters of public interest are involved. Where an incident is a matter of public interest, or the subject matter of a public investigation, a publication

---

[39] (Citations and punctuation omitted.) *Clayton v. Macon Telegraph Publishing Co.,* 173 Ga. App. 466 (326 SE2d 789) (1985).

[40] *Cabaniss,* supra at 370.

[41] (Citations and punctuation omitted.) *Assn. Svcs. v. Smith,* 249 Ga. App. 629, 633 (4) (549 SE2d 454) (2001); *Brewer v. Rogers,* 211 Ga. App. 343, 349-350 (3) (439 SE2d 77) (1993); *Cabaniss,* supra at 375-377 (3).

in connection therewith can be a violation of no one's legal right of privacy."[42] As the trial court succinctly reasoned, the evidence of record in this case raised

> suspicion, if not belief, that the young man found dead in the City Attorney's pool was the same person spotted outside plaintiff's window the night before. The circumstances surrounding Dickerson's death are of public interest and concern, and the public['s] right to information generated in the investigation by law enforcement authorities . . . defeats plaintiff's claims of [invasion of] privacy as a matter of law.

Therefore, summary judgment was properly granted on this claim as well.

*Judgments affirmed. Blackburn, P. J., and Phipps, J., concur.*

DECIDED SEPTEMBER 15, 2006 — 

*Savage, Turner, Pinson & Karsman, Brent J. Savage, Kathryn H. Pinckney,* for appellant.

*Hull, Towill, Norman, Barrett & Salley, David E. Hudson, D. Duston Tapley, Jr.,* for appellees.

---

[42] (Punctuation omitted.) *Tucker v. News Publishing Co.,* 197 Ga. App. 85, 86 (1) (397 SE2d 499) (1990), citing *Cox Communications v. Lowe,* 173 Ga. App. 812, 813 (1) (328 SE2d 384) (1985). See also *Napper v. Ga. Television Co.,* 257 Ga. 156, 161 (c) (356 SE2d 640) (1987); *Waters v. Fleetwood,* 212 Ga. 161, 167 (91 SE2d 344) (1956).