## A09A0155. GETTNER v. FITZGERALD et al.
### (677 SE2d 149)

ELLINGTON, Judge.

Mark Gettner brought this defamation action in the Superior Court of Fulton County against VNU Business Media, Inc. in connection with a report in a VNU publication that Gettner had been demoted after poor performance. After a hearing, the trial court granted VNU's motion for summary judgment, and Gettner appeals. Because there is evidence sufficient to create a jury issue on each essential element of Gettner's defamation claim against VNU, as we have explained below in Division 1, we reverse the trial court's order to the extent it granted summary judgment in favor of VNU.

In the same action, Gettner also sued his former employer, the advertising agency Fitzgerald & Company ("F&C"), and its chief executive officer, David Fitzgerald, for invasion of privacy, based on Fitzgerald's conversation with a VNU reporter about Gettner's demotion and based on F&C's alleged appropriation of Gettner's name and likeness. As we have explained below in Divisions 2 and 3, we agree with the trial court's determination that F&C and Fitzgerald are entitled to summary judgment and, therefore, affirm the trial court's ruling in that respect.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts,

viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. A defendant may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. . . . If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.

(Citations, footnote and emphasis omitted.) *Schofield Interior Contractors v. Standard Bldg. Co.*, 293 Ga. App. 812, 813 (668 SE2d 316) (2008).

Viewed in the light most favorable to Gettner, the record shows the following. In 1999, Gettner went to work for F&C as a Group Creative Director to lead one of three creative teams. After Jim Paddock, F&C's Executive Creative Director, retired, Fitzgerald promoted Gettner to fill that vacancy, which ranked at the senior vice president level, effective April 2001. According to Gettner, by July 2002, he decided he did not want to continue acting as the Executive Creative Director because he did not "want to deal with all the nuances that were not part of the creative process," such as hiring and managing subordinates. Gettner discussed his decision with Fitzgerald, and Fitzgerald agreed to allow him to return to his former position of Group Creative Director.

Fitzgerald disputes this. According to Fitzgerald, he initiated a meeting with Gettner and told him that he was being demoted because the creative teams' work under Gettner's leadership was not of high enough quality. Fitzgerald deposed that, to allow Gettner to "save face," he suggested that they jointly present the decision as having been Gettner's choice. A personnel form that was submitted to the human resources department to reduce Gettner's salary indicated that the reason for the salary change was that Gettner had "stepped down" to the position of Group Creative Director.

On July 31, 2002, Fitzgerald sent an e-mail to all F&C employees announcing that, because Gettner wanted "to be closer to the [creative] work," he was returning to his previous position as a Group Creative Director. In August 2002, Fitzgerald e-mailed Alicia Griswold, a reporter for *AdWeek*, VNU's advertising trade publication, and asked if she knew of any good executive creative directors because Gettner had "stepped down." Griswold, however, did not believe that Gettner's demotion could have been his own choice. She telephoned Fitzgerald and pressed him for the real story behind the announcement that Gettner had stepped down. Fitzgerald indicated that Gettner lacked the qualities an executive creative director

needed and had been demoted for poor performance. Fitzgerald told Griswold not to publish that information.

In March 2003, F&C reduced its workforce and terminated Gettner. On April 28, 2003, *AdWeek* released its annual "Agency Report Cards" for 2002, in which it scored the ten biggest advertising agencies in the southeast region for "Numbers," "Creative," and "Management." F&C received an overall grade of "C." Under "Management," the report card states, "CEO Dave Fitzgerald demoted [Executive Creative Director] Mark Gettner [in 2002] after poor performance; retired [Executive Creative Director] Jim Paddock started weekly visits 'to help' creative." Griswold did not contact Gettner for verification before including this information in F&C's report card. Griswold deposed that she did not need to call Gettner to verify Fitzgerald's statement that Gettner had been demoted for poor performance because she "had a fact" from the head of the agency. She also testified that an advertising consultant told her that he had seen a pitch for an account that Gettner made on behalf of F&C that was "weak," which confirmed for her that Gettner's performance was substandard.

After the report card was published, Fitzgerald asked Griswold why she printed information that was not for publication. She responded "don't ever tell a reporter anything you don't want to see in print." According to Gettner, he confronted Griswold about the report card and she admitted that she knew he had actually stepped down voluntarily. This lawsuit followed.

1. Gettner contends that a jury issue exists as to each essential element of his cause of action for defamation against VNU and, therefore, that the trial court erred in granting VNU's motion for summary judgment as to Count 1 of his amended complaint. Under OCGA § 51-5-2 (a), "[a]ny false and malicious defamation of another in any newspaper, magazine, or periodical, tending to injure the reputation of the person and expose him to public hatred, contempt, or ridicule, shall constitute a newspaper libel." There are four elements of a cause of action for defamation under this statute: the defendant's publication of a defamatory statement about the plaintiff, the falsity of the defamatory statement, the defendant's fault in publishing it, and the plaintiff's actual injury from the statement. *Mathis v. Cannon*, 276 Ga. 16, 20-21 (573 SE2d 376) (2002).[1] Because VNU's burden on summary judgment was to show

---

[1] See also OCGA § 51-5-2 (b) ("The publication of the libelous matter is essential to recovery."); *Webster v. Wilkins*, 217 Ga. App. 194, 195 (1) (456 SE2d 699) (1995) ("In considering whether a writing is defamatory as a matter of law, we look at what construction would be placed upon it by the average reader" in the context of the entire writing.) (citation and punctuation omitted).

that the evidence was not sufficient to create a jury issue on at least one essential element of Gettner's case, we consider these elements seriatim.

(a) *The defendant's publication of a defamatory statement about the plaintiff.* It is undisputed that VNU published the report about Gettner and that such a report would tend to injure Gettner's reputation and expose him to public contempt or ridicule.[2] VNU contends, however, that whether Gettner's performance was poor is a matter of opinion and, therefore, that its report about Gettner was not an actionable statement of fact. We disagree. It is true that a defamation action will lie only for a statement of fact. This is because a statement that reflects an opinion or subjective assessment, as to which reasonable minds could differ, cannot be proved false. As a result, a plaintiff who claims that a published opinion defamed him will generally be unable to carry his burden of proving the essential element of falsity.[3] Still, as the Supreme Court of Georgia explained,

> [t]here is . . . no wholesale defamation exception for anything that might be labeled "opinion." An opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false.

(Punctuation and footnotes omitted.) *Gast v. Brittain*, 277 Ga. 340, 341 (589 SE2d 63) (2003). Thus, VNU's argument fails if the allegedly defamatory statement is capable of being proved false.

Gettner's defamation claim is based on the statement in VNU's report that Fitzgerald demoted Gettner because of unsatisfactory job performance. If, as Gettner contends, he can prove that Fitzgerald demoted him for reasons *other than* unsatisfactory performance,

---

[2] See also OCGA § 51-5-4 (a) (3) (including within the definition of slander "[m]aking charges against another in reference to his trade, office, or profession, calculated to injure him therein").

[3] *Gertz v. Robert Welch, Inc.*, 418 U. S. 323, 339-340 (III) (94 SC 2997, 41 LE2d 789) (1974) ("Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.") (footnote omitted); *Kendrick v. Jaeger*, 210 Ga. App. 376, 377 (436 SE2d 92) (1993) ("[T]he expression of opinion on matters with respect to which reasonable men might entertain differing opinions is not libelous. An assertion that cannot be proved false cannot be held libelous.") (citation and punctuation omitted); *Bergen v. Martindale-Hubbell, Inc.*, 176 Ga. App. 745, 747 (3) (337 SE2d 770) (1985) (a matter that is "wholly subjective and not capable of proof or disproof" cannot be the subject of defamation).

then the defamatory statement is capable of being proved false. VNU cannot avoid liability solely by labeling the report an "opinion."[4] Indeed, VNU concedes that the issue of whether Fitzgerald demoted Gettner because of unsatisfactory performance, or for other entirely different reasons, is a matter of fact. For the foregoing reasons, a jury issue exists regarding whether VNU published a defamatory statement about Gettner.

(b) *The falsity of the defamatory statement.* VNU contends that Fitzgerald was dissatisfied with Gettner's work and, therefore, the allegedly defamatory statement was true. VNU reported, however, not only that Fitzgerald was dissatisfied with Gettner's work but also that Gettner's demotion was involuntary and resulted from Fitzgerald's assessment. To show the falsity of the statement, Gettner identified evidence in the record that he requested a voluntary demotion to increase his own job satisfaction and that Fitzgerald allowed the voluntary demotion. Even if Fitzgerald believed that acquiescing in Gettner's voluntary demotion would allow Gettner to save face or would be good for the company, VNU's report was false if Gettner's demotion did not result from Fitzgerald's dissatisfaction. Because the evidence is conflicting on this point, a jury must decide whether VNU's report about Gettner was false.

(c) *The defendant's fault in publishing the defamatory statement.* VNU contends that Gettner identified no evidence of fault, either under the malice standard that applies to public figures or under the negligence standard that applies to private figures.

(i) A plaintiff's status as either a private figure or a public figure determines the proper standard of liability for the element of fault. *Mathis v. Cannon*, 276 Ga. at 21-23 (3); *Riddle v. Golden Isles Broadcasting*, 275 Ga. App. 701, 703 (1) (621 SE2d 822) (2005). To recover in a suit for defamation, a plaintiff who is a private person must prove that the defendant acted with ordinary negligence. *Riddle v. Golden Isles Broadcasting*, 275 Ga. App. at 703 (1). A plaintiff who is a public figure, on the other hand, must meet a more stringent standard of liability; a public figure must prove by clear and convincing evidence that the defendant acted with actual malice.

---

[4] See *Mathis v. Cannon*, 252 Ga. App. 282, 283-284 (1) (556 SE2d 172) (2001) (the defendant's postings to an internet chat room, which stated and implied that the plaintiff was a thief and that he had been fired from a former job for wrongdoing, were defamatory assertions of fact that could be proven false and were not statements of opinion for which a defamation action would not lie), rev'd on other grounds, 276 Ga. 16, 25-29 (4) (573 SE2d 376) (2002); *Lively v. McDaniel*, 240 Ga. App. 132, 133-134 (1) (b) (522 SE2d 711) (1999) (statements by an insurance agent's former supervisor to an insured that the agent had taken valuable documents when he left the company, which led to difficulties with the insured's policy, were defamatory assertions of fact that could be proven false and were not statements of opinion for which a defamation action would not lie).

Id. Whether "a person is a public figure[ or a private figure] . . . is a question of law for the court to resolve." (Citation and punctuation omitted.) Id.

Even if, as in this case, the plaintiff does not hold a position "with such pervasive fame or power" that he or she is deemed to be a public figure for all purposes, the actual malice standard applies when the court determines that the plaintiff is a public figure for a limited range of issues. *Mathis v. Cannon*, 276 Ga. at 22 (3). To determine whether a person is such a limited-purpose public figure, the court reviews the nature and extent of the individual's participation in the specific controversy that gave rise to the defamation. Id. at 22-23 (3). In this three-part analysis, "a court must isolate the public controversy, examine the plaintiff's involvement in the controversy, and determine whether the alleged defamation was germane to the plaintiff's participation in the controversy." (Punctuation and footnote omitted.) Id. at 23 (3).

A public controversy is an issue that "generates discussion, debate, and dissent in the relevant community." *Mathis v. Cannon*, 276 Ga. at 24 (3). Further,

> [a] public controversy must be more than merely newsworthy. In addition, the public controversy must not be an essentially private concern such as divorce. If it is evident that resolution of the controversy will affect people who do not directly participate in it, the controversy is more than merely newsworthy and is of legitimate public concern. In short[,] if the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy.

(Citation and punctuation omitted.) *Riddle v. Golden Isles Broadcasting*, 275 Ga. App. at 705 (1) (b).[5] Although VNU's report may have appealed to its readers' "morbid or prurient curiosity"[6] about

---

[5] See also *Hutchinson v. Proxmire*, 443 U. S. 111, 135 (V) (99 SC 2675, 61 LE2d 411) (1979) ("those charged with defamation cannot, by their own conduct [in discussing the claimant in the news media], create their own defense by making the claimant a public figure"); *Waldbaum v. Fairchild Publications*, 627 F2d 1287, 1293, n. 12, 1296 (III) (D) (D.C. Cir. 1980), cert. denied, 449 U. S. 898 (101 SC 266, 66 LE2d 128) (1980) ("[E]ssentially private concerns or disagreements do not become public controversies simply because they attract attention. Rather, a public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants.") (citation and footnote omitted).

[6] See *Waldbaum v. Fairchild Publications*, 627 F2d at 1296 (III) (D), n. 23 ("matters essentially of a private nature do not become public controversies solely because members of the public find them appealing to their morbid or prurient curiosity") (citation and punctuation omitted).

264

why Gettner was demoted, there is no evidence in the record that the issue of the reasons for Gettner's change in employment status could have any substantial ramifications for anyone other than him and his immediate family. Because there was no public controversy, the record does not support a finding that Gettner was a limited-purpose public figure. Id. at 706 (1) (b).[7] "As a private person, he need only produce evidence from which a jury could infer that [VNU] acted with ordinary negligence." (Citation omitted.) Id.

(ii) Having decided that Gettner must prove that VNU acted with ordinary negligence, we must next determine the standard of care VNU owed Gettner. The standard of conduct required of a publisher in such a case

> will be defined by reference to the procedures a reasonable publisher in [its] position would have employed prior to publishing [an item] such as [the] one [at issue. A publisher] will be held to the skill and experience normally exercised by members of [its] profession. Custom in the trade is relevant but not controlling.

(Citation omitted.) *Triangle Publications v. Chumley*, 253 Ga. 179, 181 (1) (317 SE2d 534) (1984), citing Restatement (Second) of Torts § 580 (b), Comment (g) (1972).[8] In terms of verification,

> a [publisher] may be liable even for a newsworthy report if it contains a defamatory statement and the [publisher] failed to employ the procedures a reasonable [publisher] under the circumstances would have employed to assure the accuracy of the statement before [publishing] the report.

(Citation omitted.) *Diamond v. American Family Corp.*, 186 Ga. App.

---

[7] See *Rutt v. Bethlehems' Globe Publishing Co.*, 484 A2d 72, 81 (III) (B) (Pa. Super. 1984) (an obituary that implied that a local veteran's death was a suicide caused by his father's lack of love and concern did not involve a matter of public controversy with foreseeable and substantial ramifications for the members of the general public but only an essentially private concern; the father, therefore, was not a limited-purpose public figure in the context of his ensuing defamation claim against the newspaper).

[8] The defendant, if a professional disseminator of news, such as a newspaper, a magazine or a broadcasting station, or an employee, such as a reporter, is held to the skill and experience normally possessed by members of that profession. Customs and practices within the profession are relevant in applying the negligence standard, which is, to a substantial degree, set by the profession itself, though a custom is not controlling. If the defendant is an ordinary citizen, customs of the community as a whole may be relevant. Evidence of custom within the profession of news dissemination would normally come from an expert who has been shown to be qualified on the subject.

(Cross references omitted.) Restatement (Second) of Torts § 580B, Comment (g) (1977) (which replaced § 580 (b), Comment (g) (1972)).

681, 685 (1) (368 SE2d 350) (1988). To determine what fact-checking procedures a reasonable publisher would have employed under the circumstances,

> the jury is authorized to consider, among other factors: (1) whether the material was topical and required prompt publication, or whether sufficient time was available for a thorough investigation of its contents; (2) the newsworthiness of the material and public interest in promoting its publication; (3) the extent of damage to the plaintiff's reputation should the publication prove to be false; and (4) the reliability and trustworthiness of the source. The thoroughness of the accuracy check a reasonable person would make before publishing a defamatory statement will vary, depending on the relative weight of these factors and the circumstances of the case.

(Citations omitted.) *Triangle Publications v. Chumley*, 253 Ga. at 182 (1).[9]

With the proper standard of care in mind, we turn to the question of whether Gettner identified some evidence that VNU's publication of the defamatory statement was negligent. Gettner identified evidence from which the jury could find that Griswold had an ample opportunity, in the several months that elapsed from the time she received the information from Fitzgerald to the publication of the report card, to conduct a more thorough investigation of the circumstances of Gettner's demotion. In addition, the jury could find that Griswold should have questioned Fitzgerald's reliability, given that his characterization of the reasons for Gettner's demotion conflicted with his earlier e-mail and that he asked her not to publish the information. A jury could find that Griswold breached the applicable standard of care by failing to make any attempt to verify Fitzgerald's information with Gettner or others who may have had first-hand knowledge of the circumstances surrounding his demo-

---

[9] As one scholar explained, "[t]he journalism profession places extreme emphasis on the need for thorough investigation and verification. The potential for inaccuracy is greatly minimized if reporters and editors check facts and consult reliable sources." (Footnote omitted.) Lackland H. Bloom, Jr., Proof of Fault in Media Defamation Litigation, 38 Vand. L. Rev. 324, 356-357 (1985). "[T]he amount of verification [required] will depend upon a variety of factors including the amount of lead time, the seriousness of the allegation, the cost, practicality and efficacy of further verification, and the reliability of verification efforts already undertaken." Id. at 358-359. "A reporter may have failed to utilize due care by neglecting to contact an obvious source of verification, including the plaintiff." (Footnote omitted.) Id. at 363. "To expect a reporter to at least make a good faith effort to contact a source whom the reporter knows is likely to possess significant information pertaining to the accuracy of potentially defamatory allegations, especially when the source is readily accessible, is not unreasonable." Id. at 365.

tion.[10] For the foregoing reasons, a jury issue exists regarding whether VNU's publication of the defamatory statement was negligent.[11]

(d) *The plaintiff's actual injury from the defamatory statement.* VNU does not contend that Gettner suffered no injury.[12]

Because VNU failed to discharge its burden on summary judgment of showing that there was insufficient evidence to create a jury issue as to at least one essential element of Gettner's cause of action for defamation under OCGA § 51-5-2, the trial court erred in granting VNU's motion for summary judgment as to Count 1 of Gettner's amended complaint.

2. Gettner contends that a jury issue exists as to his claim against F&C and Fitzgerald for public disclosure of embarrassing facts,[13] and, therefore, that the trial court erred in granting their motion for summary judgment as to Count 3 of his amended complaint. As F&C and Fitzgerald contend, however, after Fitzgerald disclosed the embarrassing facts to Griswold in August 2002,[14]

---

[10] Griswold deposed that, as a reporter, she should question a person's motives in giving information. In addition, although Griswold did not consider the agency report card to be "a story" about Gettner being demoted, she deposed that, when she is writing a story about someone being fired, it is her responsibility as a journalist to contact that person and give him the opportunity to respond to allegations of wrongdoing.

[11] See *Ga. Society of Plastic Surgeons v. Anderson*, 257 Ga. 710, 712-714 (3) (363 SE2d 140) (1987) (evidence authorized a plaintiffs' verdict in a libel case concerning an article in a medical trade magazine suggesting that certain otolaryngologists were unjustifiably claiming an aptitude for doing cosmetic surgery on the head and neck where the authors of the piece had no objective reason to impugn the plaintiffs' qualifications); *Stalvey v. Atlanta Business Chronicle*, 202 Ga. App. 597, 599-600 (1) (414 SE2d 898) (1992) (jury question existed regarding whether newspaper article defamed an apartment manager by implying that he had obstructed a police investigation into a series of sexual assaults in order to protect the apartment complex from being deserted by other tenants); *Diamond v. American Family Corp.*, 186 Ga. App. at 684-685 (1) (jury question existed regarding whether a television broadcast defamed a real estate broker by implying that he knowingly sold a bigger tract of land than his client actually owned).

[12] See *Southern Co. v. Hamburg*, 220 Ga. App. 834, 840 (3) (470 SE2d 467) (1996) ("Statements which tend to injure one in his or her trade, occupation, or business have been held to be libelous per se, and one need not prove special damages in such instances.") (citations and punctuation omitted).

[13] In Georgia, the tort of invasion of privacy protects, inter alia,
the right to be free from unwarranted publicity as well as from the publicizing of one's private affairs with which the public has no legitimate concern. There are at least three elements necessary to recovery for an invasion of one's right of privacy: (a) the disclosure of private facts must be a public disclosure; (b) the facts disclosed to the public must be private, secluded or secret facts and not public ones; (c) the matter made public must be offensive and objectionable to a reasonable man of ordinary sensibilities under the circumstances.
(Citations and punctuation omitted.) *Dortch v. Atlanta Journal &c.*, 261 Ga. 350, 352 (2) (405 SE2d 43) (1991).

[14] OCGA § 51-5-3 ("A libel is published as soon as it is communicated to any person other than the party libeled."); *Torrance v. Morris Publishing Group*, 281 Ga. App. 563, 566-567 (1) (636 SE2d 740) (2006) (alleged defamation by police officer was published as soon as the officer

Gettner expressly released F&C and Fitzgerald from any invasion of privacy claim he had as of March 5, 2003, whether known or unknown.[15] Gettner has not shown any basis for concluding that the release was not enforceable. See *Hudson v. Montcalm Publishing Corp.*, 190 Ga. App. 629, 632 (2) (379 SE2d 572) (1989). Accordingly, the trial court correctly granted summary judgment to F&C and Fitzgerald as to Count 3 of Gettner's amended complaint.

3. Gettner contends that a jury issue exists as to his claim against F&C and Fitzgerald for misappropriation of his name and likeness, and, therefore, that the trial court erred in granting their motion for summary judgment as to Count 2 of his amended complaint. Gettner showed that, for months after he left the company, F&C's website continued to identify him as the Executive Creative Director and to display his credentials and his picture. Gettner failed to make out a prima facie case for invasion of privacy through misappropriation, however, by failing to identify any evidence in the record that F&C or Fitzgerald benefitted from the unauthorized use of Gettner's credentials or image.[16] Accordingly, the trial court correctly granted summary judgment to F&C and Fitzgerald as to Count 2 of Gettner's amended complaint.

*Judgment affirmed in part and reversed in part. Johnson, P. J., and Mikell, J., concur.*

DECIDED APRIL 1, 2009.

*Barrett & Farahany, Amanda A. Farahany*, for appellant.
*Alston & Bird, Paul J. Kaplan, Epstein, Becker & Green,*

---

communicated the information to a person other than the party libeled, that is, when the police officer told a newspaper reporter facts she discovered during an investigation, rather than when the newspaper published an article about the incident months later).

[15] As a condition of receiving severance pay, Gettner executed a release on March 5, 2003, that provided that he

release[d] and waive[d] all legal claims in law or in equity of any kind whatsoever that [he] ha[d] or may have against [F&C], . . . [and its] officers, directors, [and] employees. . . . [The] release and waiver covers all rights, claims, actions and suits of all kinds and descriptions that [he had at the time of signing] or has ever had, whether known or unknown or based on facts . . . known or unknown [at the time of signing], fixed or contingent, against the Releasees, occurring from the beginning of time up to and including the date that [he] execute[d] [the] release, including . . . any claims for . . . invasion of privacy.

[16] See *Thomas v. Food Lion*, 256 Ga. App. 880, 884 (2) (570 SE2d 18) (2002) ("An essential element of the 'appropriation for one's advantage' category of breach of privacy is that the wrongdoer appropriate the plaintiff's likeness to the wrongdoer's advantage. There must be an appropriation for the defendant's benefit, advantage, or use for commercial exploitation.") (footnotes omitted). See also *Martin Luther King, Jr. Center for Social Change v. American Heritage Products*, 250 Ga. 135, 142 (1) (296 SE2d 697) (1982) (In a case alleging an invasion of privacy based on the appropriation, for the defendant's advantage, of the plaintiff's name or likeness, "the measure of damages is the value of the use of the appropriated publicity.") (citation and punctuation omitted).

*Kenneth G. Menendez, Jeffery R. Saxby*, for appellees.