A08A0018. CITY OF ATLANTA v. HOFRICHTER/STIAKAKIS.

(663 SE2d 379)

MIKELL, Judge.

Eva Hofrichter/Stiakakis ("Hofrichter") sued the City of Atlanta for nuisance arising from its failure to properly maintain a storm pipe that traversed and served her property, resulting in extensive flooding of the land and her home. Following a bench trial, the trial court awarded $510,376 in damages attributable to the nuisance and $325,148 in costs of litigation and attorney fees. Asserting several enumerations of error, the City appeals the judgment. We affirm.

1. The City contends that the evidence was insufficient as a matter of law to support the trial court's judgment, arguing (a) that it was not responsible for maintaining the pipe and (b) that the trial court erred in concluding that it was estopped from denying liability for the maintenance of a private structure merely because it undertook to help Hofrichter. We disagree.

When the trial court sits as the trier of fact, its findings and conclusions have the effect of a jury verdict. Thus, we will not disturb the trial court's decision if there is any evidence to support it. Additionally, . . . we view the evidence in the light most favorable to the trial court's judgment.[1]

However, where the issue decided is one of law, not fact, then the plain legal error standard of review applies.[2]

Viewed in a light most favorable to the trial court's findings, the evidence shows that Hofrichter and her husband purchased a home at 1925 Windemere Drive in Atlanta in 1985. Unbeknownst to the Hofrichters, an underground storm drainage pipe traversed their property. The pipe, which was connected to a catch basin on Windemere Drive, drained storm and surface water from the street into a ditch at the edge of Hofrichter's property, and ultimately into a nearby creek. The catch basins or drains are owned and maintained by the City. Sometime in 1996 or 1997, Hofrichter noticed flooding in the street and on her property resulting from the clogged catch basin. Her husband called to report the problem and the City sent workers to clean the basin. In October 1998, Hofrichter again called the City to complain about flooding. At that time, the City discovered a ruptured pipe and returned to the property two or three times that year to repair it. According to Alan Moore, the City's watershed manager, the City also responded to a problem with the pipe in 2000.

In early 2002, Hofrichter noticed "a geyser [in her yard] shooting red clay . . . several feet in the air" and flooding her property and home. Beginning in February 2002, Hofrichter phoned the City repeatedly to complain about the problem. On May 9, 2002, Levon Crum, a waste water collection specialist for the City, came to investigate. Crum noted flooding in the basement of the home, storm water flowing through the yard, and a cave-in near the storm line in the yard. Crum reported the problem to his supervisor and recommended that the City perform a dye test to determine if there was a problem with the storm pipe, causing the cave-in; Crum did not know whether a dye test had been performed. Shortly thereafter, the City determined that it did not have a storm water easement at 1925 Windemere. On January 29, 2003, Marshall Hall, a waste water sewer specialist for the City, returned to inspect the property and observed that the yard was flooded with water coming from the underground storm drainage pipe. The water was ankle deep and

---

[1] (Citations and punctuation omitted.) *Hathaway Dev. Co. v. Advantage Fire Sprinkler Co.*, 290 Ga. App. 374 (659 SE2d 778) (2008).

[2] *Simmons v. Bd. of Tax Assessors of Effingham County*, 268 Ga. App. 411 (1) (602 SE2d 213) (2004).

Hall noticed several sinkholes in the ground. Hall also inspected the interior of the home and observed three inches of water in the basement. Hall noted that the situation required immediate attention, and recommended that the City inspect the pipe with a closed circuit camera. Hall could not "say for sure that [his recommendations] were followed." According to Miles McCullough, the City's waste water collection superintendent, the City did not inspect the pipe with a closed circuit camera at that time.

Hofrichter called several more times in the spring of 2002 to report continued flooding on her property and a collapsed storm drain. The City repaired portions of the pipe in May 2003; however, more sinkholes developed, existing sinkholes became larger and deeper, and the flooding continued. According to the City's records, Hofrichter made further complaints in October and December 2004, and the early part of 2005.

The flooding caused extensive damage to Hofrichter's yard, home, and personal property. According to Hofrichter, trash washed up into the yard, the home became infested with ants and rats, and she began to suffer from migraines caused by mold growth. Hofrichter finally moved out of the home in January 2005, and sold it in November 2006 for approximately $130,000 less than its fair market value.

On December 17, 2004, Diane Mitchell, the City's claims manager, advised the waste water department to "take care of" the problem at 1925 Windemere. On January 31, 2005, City workers replaced a portion of the storm pipe. The next day, workers returned because the pipe had sprung a leak at the seal between the new repair and the old pipe. In May 2005, after further complaints from Hofrichter that water was seeping through the ground, the City inspected the pipe with a closed circuit camera and determined that it was badly deteriorated and collapsing. Shortly after that discovery, City workers dug up Hofrichter's yard and replaced the entire pipe. The work was completed in August 2005. According to the City, it repaired — and eventually replaced — the pipe because the storm line could have ruptured, compromising the integrity of the sanitary sewer system.

Hofrichter served the City with ante litem notice in December 2004, and filed the instant action on October 12, 2005. After hearing all the evidence, the trial court entered a judgment containing detailed findings of fact and conclusions of law. In particular, the trial court concluded that under City Ordinance § 74-428, the subject pipe was part of the City's storm sewer system and that, therefore, the City was responsible for its proper functioning. The trial court alternatively concluded that the City was estopped from denying liability because it used the pipe for its own benefit, undertook to

maintain it, and never disclaimed responsibility for its maintenance until Hofrichter filed suit.

(a) The City contends that the trial court erred in concluding that it exercised dominion and control over the pipe such that it was charged with its continued maintenance and for the creation and maintenance of a nuisance. In this regard, the City claims (i) that the trial court incorrectly relied on the ordinance, which specifically limits the City's responsibility to those portions of the storm sewer system that are in the public right-of-way, subject to easements, or otherwise on public lands, and (ii) that the City has at all times taken the position that the subject pipe was a private structure over which it had no control, and that it repaired — and ultimately replaced — the pipe only to ensure the integrity of a parallel sanitary sewer line.

Because we find the trial court's alternative conclusion correct, we need not address the City's claim regarding the ordinance. "[W]here a municipality negligently constructs or undertakes to maintain a sewer or drainage system which causes the *repeated* flooding of property, a continuing, abatable nuisance is established, for which the municipality is liable."[3] Further, "[w]hile ownership of property generally may give rise to a nuisance when property is used to cause harm to others, such ownership is not an essential element of the cause of action for nuisance."[4] "Rather, the exercise of dominion or control over the property causing the harm is sufficient to establish nuisance liability."[5]

The City contends that it cannot be held liable under *Hibbs v. City of Riverdale*[6] because it has at all times taken the position that the pipe was a private structure over which it had no control. While we agree with the City that there is no evidence that it installed the subject pipe or owned an easement relating to it, the record clearly shows that the City "undertook to maintain" the pipe for over seven years, including repair and replacement.[7] Such exercise of control is sufficient to establish nuisance liability.

The City further claims that *City of Columbus v. Barngrover*[8] is inapplicable because in that case, the City of Columbus exercised a

---

[3] (Citations omitted; emphasis in original.) *Hibbs v. City of Riverdale*, 267 Ga. 337, 338 (478 SE2d 121) (1996). See also *City of Gainesville v. Waters*, 258 Ga. App. 555, 557 (1) (574 SE2d 638) (2002); *Martin v. City of Fort Valley*, 235 Ga. App. 20, 21 (1) (508 SE2d 244) (1998).

[4] (Punctuation omitted.) *City of Columbus v. Barngrover*, 250 Ga. App. 589, 592 (1) (a) (552 SE2d 536) (2001), citing *Fielder v. Rice Constr. Co.*, 239 Ga. App. 362, 365 (1) (522 SE2d 13) (1999).

[5] (Citation and footnote omitted.) *City of Columbus*, supra, citing *Hibbs*, supra at 338.

[6] Supra.

[7] See, e.g., *City of Columbus*, supra. Compare *Merlino v. City of Atlanta*, 283 Ga. 186, 189 (2) (657 SE2d 859) (2008).

[8] Supra.

greater degree of dominion and control over the subject pipe; here, there is no evidence that the pipe was ever maintained by the City at any time prior to spring 2003. On the contrary, the evidence clearly shows that the City visited the property several times in 1998 and 2000 to repair the pipe. The fact that the City of Columbus maintained the subject pipe for many more years is not dispositive. In *DeKalb County v. Orwig*,[9] our Supreme Court addressed the question of whether, as a matter of law, two sewer overflows constituted an actionable continuing nuisance.[10] The Court found that

> [t]he condition involved here, maintaining a sewer line with an obstruction, was continuous from the time Georgia Power first damaged the sewer line until it was repaired by DeKalb County. Since there was some evidence in the record to support a finding that DeKalb County knew or should have known after the first overflow that the obstruction was in its line, there is a question of fact whether the county was responsible for the second overflow and, thereby, for maintaining a nuisance.[11]

In its opinion, the Court referenced our holdings in *Desprint Svcs. v. DeKalb County*[12] and *Ingram v. Baldwin County*.[13] In the former case, we held that a single malfunction in the operation of a public works project was not an actionable nuisance,[14] while in the latter case, we held that two occurrences of sewage overflow raised a question of fact concerning whether the county had created an actionable nuisance.[15] In this case, the City "took . . . affirmative steps to repair, restore, or maintain the pipe"[16] for over seven years. Moreover, as in *Orwig*,[17] the record here supports a finding that the City knew or should have known as early as 2002 that the pipe was damaged or deteriorated. Instead of properly investigating the situation at that time, by means of a dye test or by use of a closed circuit camera, as recommended by its employees, the City maintained the nuisance until 2005, all while Hofrichter incurred additional damage.

Moreover, we note that another circumstance in the instant case

---

[9] 261 Ga. 137 (402 SE2d 513) (1991).

[10] Id.

[11] Id. at 139 (2).

[12] 188 Ga. App. 218 (372 SE2d 488) (1988).

[13] 149 Ga. App. 422 (254 SE2d 429) (1979).

[14] *Desprint Svcs.*, supra at 219-220 (2).

[15] *Ingram*, supra at 423.

[16] *Merlino*, supra.

[17] Supra.

makes it factually similar to *City of Columbus*.[18] In reaching our decision in that case we noted that the City's director of public services acknowledged that the drainage system under the Barngrovers' property carried water channeled from City streets and was part of the City system.[19] Here, Moore and McCullough acknowledged that the pipe under Hofrichter's property carried water channeled from a City street, via the catch basins which were admittedly owned and maintained by the City. Accordingly, contrary to the City's claim, *City of Columbus* is applicable and controlling in the instant case.

(b) The City contends that it was not legally required to repair the pipe, and that its attempt to help Hofrichter should not act as an estoppel against it. Having found that the City exercised sufficient control to establish nuisance liability, we need not reach the issue of whether the City was estopped from denying liability.

2. The City contends that the trial court erred in awarding attorney fees, because there is no evidence that it acted in bad faith. We disagree.

> In order to recover attorney fees as expenses of litigation pursuant to OCGA § 13-6-11, the plaintiff must show that the defendant acted in bad faith, was stubbornly litigious, or caused the plaintiff unnecessary trouble and expense. We will affirm an award of attorney fees under OCGA § 13-6-11 if there is any evidence to support it.[20]

"It is only necessary to the plaintiff's recovery that he show any one of these three conditions exists."[21] "Bad faith warranting an award of attorney fees must have arisen out of the transaction on which the cause of action is predicated. It may be found in how defendant acted in his dealing with the plaintiff."[22] The question of bad faith in the underlying transaction is for the trier of fact to determine.[23]

Relying on *City of Gainesville v. Waters*,[24] the trial court implicitly ruled that attorney fees were justified because the City failed to maintain drainage control despite its knowledge that Hofrichter's property flooded as a result. Hofrichter contends that the City acted

---

[18] Supra.

[19] Id. at 592 (1) (a).

[20] (Footnote omitted.) *Hibbard v. McMillan*, 284 Ga. App. 753, 757 (3) (645 SE2d 356) (2007).

[21] (Citation and punctuation omitted.) *City of Gainesville*, supra at 559 (4).

[22] (Citation and punctuation omitted.) Id.

[23] *Monterrey Mexican Restaurant &c. v. Leon*, 282 Ga. App. 439, 451 (6) (b) (638 SE2d 879) (2006).

[24] Supra.

in bad faith by its course of dealing with her for eight or nine years. In this regard, Hofrichter points out that the City (1) ignored recommendations of its own employees to test the line; (2) never disclaimed responsibility for the flooding on her property or maintenance of the pipe; and (3) first controverted responsibility when Hofrichter filed the instant action. The City argues that it responded timely to Hofrichter's complaints about its overflowing catch basins in the late 1990s, and justifiably delayed responding to her complaints about the storm pipe because it did not have an easement. The City points out that even though it did not have an easement, it nonetheless attempted to fix the pipe twice in 2003.

There is evidence to support the trial court's finding that the City acted in bad faith. Hofrichter complained for over seven years about flooding, sinkholes, and other problems on her property. City workers observed water in Hofrichter's basement and sinkholes in her yard, and recommended that immediate action be taken, including dye testing and use of a closed circuit camera. The City ignored these recommendations, asserting that it did not have an easement. Instead of advising Hofrichter of this alleged fact, the City returned to the property several times to repair the pipe. The City finally "took care of the problem" after Hofrichter filed her ante litem notice. As there is some evidence to support a finding of bad faith under OCGA § 13-6-11, the trial court's ruling must be affirmed.

3. The City also contends that the award of attorney fees should be vacated because, even though Hofrichter produced the contingent fee contract, she failed to produce legally sufficient evidence of the value of the contingency.

> In Georgia, an attorney cannot recover for professional services without proof of the value of those services. A court may consider a contingent fee agreement and the amount it would have generated as evidence of usual and customary fees in determining both the reasonableness and the amount of an award of attorney fees. When a party seeks fees based on a contingent fee agreement, the party must show that the contingency fee percentage was a usual or customary fee for such case and that the contingency fee was a valid indicator of the value of the professional services rendered. In addition, the party seeking fees must also introduce evidence of hours, rates, or some other indication of the value of the professional services actually rendered.[25]

---

[25] (Citations and punctuation omitted.) *Home Depot U.S.A. v. Tvrdeich*, 268 Ga. App. 579, 584 (2) (602 SE2d 297) (2004). See also *Patton v. Turnage*, 260 Ga. App. 744, 748 (2) (580 SE2d 604) (2003).

On the issue of fees, Hofrichter introduced the written contingency fee contract pursuant to which she agreed to pay 40 percent of any recovery as attorney fees. Her attorney testified that the customary fee in such a case is usually 40 percent; that he and co-counsel had taken over 26 depositions and had spent hundreds of hours on the case; and that his firm had expended $38,948.04 in litigation expenses. The City did not cross-examine counsel on the issue of fees or offer any evidence to the contrary. We find that the evidence was sufficient to establish that the contingency fee charged by counsel was reasonable.[26]

4. The City contends that the trial court's compensatory damage award of $300,000 was excessive and should be set aside on appeal. In this regard, the City appears to argue that there is no basis for the award because Hofrichter's physician never testified that Hofrichter suffered any adverse medical problems related to the flooding.

Under OCGA § 51-12-2 (a), general damages are those presumed to flow from a tortious act and may be recovered without specific proof of any amount. Pursuant to OCGA § 41-1-4, a plaintiff in an action for nuisance may recover for both damage to person and damage to property.

> Damages for discomfort and annoyance caused to the owner are separate and distinct from damage to the value of the realty. An award of damages for discomfort and annoyance is [a matter committed to the factfinder] and should not be disturbed if there is any evidence to support it.[27]

Moreover, "[e]ven though the evidence is such as to authorize a greater or lesser award than that actually made, the appellate court will not disturb it unless it is so flagrant as to 'shock the conscience.'"[28]

In this case, there was evidence that Hofrichter suffered special damages in the amount of $203,376, including loss of personal property, diminution in the value of her property, and rental expenses incurred when she was forced to move from her home. There was also sufficient evidence to support an award of damages for

---

[26] See *Home Depot*, supra. Compare *Patton*, supra.

[27] (Citations and punctuation omitted.) *Segars v. Cleland*, 255 Ga. App. 293, 296 (1) (564 SE2d 874) (2002). See *Blanton v. Duru*, 247 Ga. App. 175, 178 (5) (543 SE2d 448) (2000) (award of damages for mental anguish in action for wrongful foreclosure is a matter committed to the factfinder).

[28] (Citation and punctuation omitted.) *Consolidated Freightways Corp. &c. v. Futrell*, 201 Ga. App. 233, 234 (2) (410 SE2d 751) (1991).

personal injuries, and damages for annoyance and discomfort. Hofrichter spent over seven years battling sinkholes in her yard and flooding in her home. Her home was infested with rats, insects, and mold, and her physician testified that she smelled of mold and suffered from mold-induced migraines. Given this evidence, we cannot say that the damage award shocks the conscience, nor is there any clear indication of bias, prejudice or gross mistake. The award of $300,000 was not, as a matter of law, excessive.[29]

5. Lastly, the City asserts several arguments related to Hofrichter's filing of her ante litem notice. First, the City claims that as a matter of law it is liable only for damages incurred for the six-month period before Hofrichter filed her ante litem notice. Second, the City claims that the record does not support a finding of bad faith under OCGA § 13-6-11, because the record reflects that within the period covered by the ante litem notice and thereafter, the City was making a bona fide attempt to resolve Hofrichter's complaints. However, the City has not indicated where in the record it raised these issues with the trial court, or whether the trial court considered these issues in its ruling. "[W]here enumerated errors on appeal attempt to raise for the first time questions not raised in the trial court, they present nothing for decision."[30] Notwithstanding this waiver, as the trial court's order does not specify the time period covered, we will not presume error.[31]

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

DECIDED JUNE 13, 2008.

*Robert N. Godfrey*, for appellant.
*Martin & Jones, Samuel L. Starks, Clinton W. Sitton*, for appellee.

---

[29] See *Zieve v. Hairston*, 266 Ga. App. 753, 760 (4) (598 SE2d 25) (2004) (compensatory damage award of $250,000 not excessive).

[30] (Citations omitted.) *Financial Bldg. Consultants v. St. Charles Mfg. Co.*, 145 Ga. App. 768, 770-771 (2) (244 SE2d 877) (1978). See also *SAKS Assoc. v. Southeast Culvert*, 282 Ga. App. 359, 365 (3) (638 SE2d 799) (2006); *Rafizadeh v. KR Snellville*, 280 Ga. App. 613, 616 (2) (634 SE2d 406) (2006).

[31] See, e.g., *Infinite Energy v. Ga. Public Svcs. Comm.*, 257 Ga. App. 757, 759 (1) (572 SE2d 91) (2002) (absent affirmative evidence showing that the trial court applied the wrong standard of review, we will not presume error).